Stella **CHERTKOVA, Plaintiff–Appellant,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE CO., Defendant–Appellee.**

No. 1139, Docket 95–7849.

United States Court of Appeals, Second Circuit.

Argued March 19, 1996.

Decided Aug. 9, 1996.

Steven D. Ecker, Hartford, Connecticut (Cowdery & Ecker, of counsel), for Plaintiff–Appellant Stella Chertkova.

James B. Herman, Philadelphia, Pennsylvania, for Defendant–Appellee Connecticut General Life Insurance Co.

Before: FEINBERG, CARDAMONE, and MAHONEY, Circuit Judges.

CARDAMONE, Circuit Judge:

Stella Chertkova appeals from an order of the United States District Court for the Dis-

trict of Connecticut (Covello, J.), entered July 25, 1995, granting summary judgment in favor of defendant Connecticut General Life Insurance Co. (defendant, Connecticut General, or employer). The issue presented is the propriety of granting summary judgment on plaintiff's claim that her former employer discharged her because of her gender in violation of Title VII of the Civil Rights Act of 1964.

Plaintiff charged in her complaint, in substance, that managers in one of defendant's departments did not tolerate intelligent and articulate female subordinates. Instead, she claims, they insisted on maintaining a work environment where, in the words of Jane Austen, "[a] woman especially, if she have the misfortune of knowing anything, should conceal it as well as she can." Jane Austen, *Northanger Abbey* 94 (Signet Classic ed. 1965). This alleged treatment of a woman employee is a *bête noire* under Title VII and is conduct the civil rights law aimed to end.

Chertkova contends these managers engaged in a campaign of harassment to cause her to lose her employment because of her gender. The employer avers that plaintiff's employment terminated because of longstanding performance deficiencies, including an alleged inability to communicate effectively with customers and scornful treatment of company managers. The record also reveals disagreement as to whether plaintiff quit, was terminated, or was compelled to leave by intolerable working conditions. Because these questions present issues of material fact, we reverse the grant of summary judgment and remand this case for trial.

## BACKGROUND

### A. *Plaintiff's Employment Experience*

Stella Chertkova was hired by Connecticut General as a computer programmer in 1979, and for over ten years held various computer-related posts in its Operations Engineering department, including the positions of Technical Consultant and Senior Systems Consultant, working under a number of different supervisors. Her work required that she deal with "customers" within the company, that is, those Connecticut General employees who used the systems she helped design. Because plaintiff allegedly needed help in interpersonal relationships with peers and customers, her supervisor Patricia Endweiss "coached" her in 1989 and 1990 to improve her communication skills. Thereafter—as observed by coworkers Robert Godin and Mary Bosch—her interaction with others improved dramatically.

Plaintiff's high level of technical competence was widely recognized within the company. Endweiss commented in a March 1990 evaluation that Chertkova quickly assimilates technical information, always presents a well thought-out technical design, and consistently offers efficiencies above and beyond requirements. Supervisor Michael Rocchio stated that she well understood the technology associated with her work. Co-employee Adrienne Burnett described her technical skills and knowledge of computer systems as excellent, and she was given a company award in 1989 for her handling of a complex project.

In mid-1990 Craig May took over the Operations Engineering department and told plaintiff to report to Jeff O'Neil, a project manager, instead of her then-supervisor Patricia Endweiss. According to former Connecticut General manager Melanie Konicki, O'Neil was not competent and had difficulties in dealing with "assertive and competent" women. Nonetheless, May quickly promoted O'Neil. Endweiss, who along with plaintiff was considered to be among the most technically competent persons in the department, was placed on probation for exhibiting a "lack of active listening skills," and was terminated in January 1992.

Meanwhile, Chertkova asserts, May and O'Neil began a campaign of harassment calculated to force her out of her job. According to Konicki's affidavit, "it was a recognized practice ... to document a pattern of failure in order to get rid of an undesirable employee." Plaintiff declared that during May's first year as department head, he never spoke to her about professional matters but frequently stopped by her office for personal reminiscences, mostly "macho" stories relating his experiences with women. He also called her a "clotheshorse."

In the summer of 1990 Chertkova attended a presentation to introduce employees to her employer's parent company CIGNA's "Operating Values" project, with its emphasis on "People, Quality, Teamwork, Leadership, [and] Knowledge." According to plaintiff, she asked some questions but did not embarrass the CIGNA representative or anyone else. Defendant asserts that plaintiff acted in a disruptive manner, asking critical and inappropriate questions about management.

In early 1991 CIGNA introduced the concept of "Total Quality Management" (TQM), which avowedly allowed employees "to express their ideas and opinions openly and honestly at all levels." Chertkova attended an Operations Engineering meeting led by Bob Strickler, Craig May's immediate superior, for the purpose of discussing TQM. She made a number of comments and posed several questions, but insists that none of her comments were inappropriate or negatively intended or received. A few weeks later, however, O'Neil placed her on an informal "performance improvement plan" to address such areas as "active listening skills." Although she was taken to task for her comments at the Strickler meeting, male employees who challenged Strickler—even one who became "visibly angry" with Strickler's answers—did not receive the same harsh treatment. Chertkova believes this differing response from management is evidence that women in the department were treated differently than men.

During the first three years of May's tenure as head of the department, two of the three women who were terminated (that is, plaintiff and Endweiss) were terminated for "communication" reasons. No men were fired during this period. After this litigation was instituted, three men were discharged, but none for lack of communication skills. Plaintiff also charges that May advanced men such as O'Neil, despite his lack of technical competence, and promoted two women who were without technical training while he terminated plaintiff and Endweiss, who were among the most competent employees in the department.

In the summer of 1991 O'Neil held "coaching sessions" with Chertkova. In her affidavit she relates that he "called her into an office with closed doors and berated and yelled at [her] for hours." During these meetings O'Neil threatened her, saying: "What do you hope for? Do you think you are going to outlive us? There is no chance! You are not going to be here!" After one such session, plaintiff left in tears and went to see June Cocolla, the division personnel officer, who promised to intervene and subsequently did attend a coaching session. O'Neil became very angry with Cocolla for providing assistance to plaintiff. Cocolla's efforts to be supportive soon ended, although she later sent plaintiff a book entitled *You Just Don't Understand: Men and Women in Conversation*, which discusses differences in women's and men's communication styles and the problems resulting from those differences.

Later that summer O'Neil placed Chertkova on formal probation, the conditions of which included: "demonstrat[ing] the behaviors intrinsic to the published *teamwork* Operating Values," giving dissenting opinions "constructively and in the appropriate, private setting," and improving "written communications," and "active listening skills." Plaintiff successfully completed probation in October 1991, but was told she could be fired immediately or at any time during the next two years if she did not "maintain satisfactory performance" in a number of specified areas, including improving her written and "verbal communications." Yet, when Chertkova asked to attend a course on "communication skills" offered to all other department employees, her request was denied. In late 1991 plaintiff was reassigned to Supervisor Teresa Quirk, who wrote an "excellent" performance evaluation of plaintiff in December, but told plaintiff in January that Craig May—whom Quirk said she feared—found the appraisal of plaintiff "too good" and ordered Quirk to rewrite it.

## B. *Plaintiff's Employment Ends*

Plaintiff discovered on March 5, 1992 that her supervisor was soliciting other company employees for negative information about her. On that same day, she suffered a nervous breakdown and left work. She never

returned. As it happened, Teresa Quirk had prepared a letter of termination dated March 6, 1992 that referred to plaintiff's purported failure to live up to the admonitions that followed her probation and her failure to complete in a timely fashion a recent assignment for O'Neil. Chertkova said she did not receive the letter at that time.

Following her breakdown, plaintiff applied for and received short-term disability benefits from Connecticut General for a period of 26 weeks. During the summer of 1992 she worked on a proposal for automating administrative functions at CIGNA and submitted it through the "Employee Suggestion Plan." The submission was rejected. She maintains that her efforts to communicate with her employer were turned aside. At a deposition in January 1993 relating to her worker's compensation claim, plaintiff first learned of the March 6, 1992 termination letter.

### C. The District Court's Decision

As a result, she filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC), which issued a notice of right to sue on July 19, 1993. Plaintiff initiated the instant action on October 12, 1993. On August 16, 1994 Quirk wrote a letter to plaintiff stating she was terminated as of August 12, 1994, based upon the fact that her request for long-term disability benefits had been denied, that she did not intend to return, and that she had taken another job.

In its motion for summary judgment, defendant contended that no conduct of May's evidenced gender bias against plaintiff. It noted that May promoted two female managers—Teresa Quirk and Lucille Davis—and maintained that Chertkova's performance deficiencies were well-documented. Although she disagreed with the alleged performance deficiencies, defendant notes that she admitted she was difficult to work with, had contempt for management, and told others within the company that her managers were incompetent.

Granting summary judgment for defendant, the trial court ruled that plaintiff had failed to establish a *prima facie* case of employment discrimination. It held that plain-

tiff was not discharged from her employment, reasoning that her working conditions were not so intolerable that a reasonable person would have felt compelled to leave. It characterized plaintiff's case as being one that relied on unfair performance evaluations, cold treatment by management, management's failure to give her a performance award, and her belief that she was overworked. None of these circumstances sufficed, in the district court's view, to show a constructive discharge. It also ruled that plaintiff failed to establish a *prima facie* case because she did not demonstrate "that her position remained open and that the defendant continued to seek applicants."

Assuming that a *prima facie* case existed, the district court further stated that defendant had articulated a legitimate reason for terminating Chertkova—deficient performance—and that because plaintiff relied on conclusory allegations of discrimination, no genuine issue of material fact existed with respect to whether the proffered reason was a pretext for gender discrimination. From this decision, Chertkova appeals.

### DISCUSSION

### I  General Standards Applicable

#### A. Summary Judgment

We have repeated the rules governing summary judgment frequently, so only a brief comment is necessary. Such relief may be granted only when the movant carries its burden of demonstrating there is no genuine issue of material fact for trial, and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor. *See Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994).

In prior cases, we have also emphasized that trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue. *See, e.g., Gallo,* 22 F.3d at 1224; *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989). Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

### B. *Shifting Burdens of Proof*

The disposition of employment discrimination actions is governed by standards of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 802–05, 93 S.Ct. 1817, 1822, 1824–26, 36 L.Ed.2d 668 (1973), which are intended "progressively to sharpen the inquiry into the elusive factual question of intentional discrimination," *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094–95 n. 8, 67 L.Ed.2d 207 (1981). The aggrieved employee bears the initial burden of establishing a *prima facie* case of unlawful discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. This burden is light. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. Where the alleged discrimination arises from an employer's refusal to hire the plaintiff, for example, a *prima facie* case may rest upon proof that the plaintiff (1) is a member of a protected class, (2) applied for the subject position and was qualified to hold it, (3) was rejected, and (4) the position thereafter remained open and defendant "continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. As discussed in greater detail below in Part II B., this final requirement can be satisfied in different ways. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13.

If the plaintiff successfully proves a *prima facie* case, a presumption of unlawful discrimination arises. *See Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *see also St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 508–520, 113 S.Ct. 2742, 2747–54, 125 L.Ed.2d 407 (1993). The burden of production then shifts to the employer, which must articulate a legitimate reason for the challenged employment decision, *see Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, and, if it does so, plaintiff must be allowed to show that the proffered reason was pretextual, and that the real reason was discriminatory. *See Hicks,* 509 U.S. at 515, 113 S.Ct. at 2751–52. The factfinder must decide whether plaintiff carried her ultimate burden of persuasion with respect to whether "the defendant intentionally discriminated" against her based on the unlawful criterion. *Id.* at 511, 113 S.Ct. at 2749. These shifting burdens of proof apply in this case involving alleged discrimination on account of gender.

Connecticut General argues that plaintiff failed to make out a *prima facie* case because she was not discharged and because she did not show that her position remained open following her alleged termination and that defendant continued to seek other applicants. Defendant also declares that plaintiff was unable to demonstrate that its proffered nondiscriminatory reason—deficient performance—was pretextual.

### II  Gender Discrimination— *Prima Facie* Case

### A. *Discharge From Employment*

One of the elements of a *prima facie* case of discriminatory discharge, as one might expect, is that the employee was discharged. *See* 42 U.S.C. § 2000e–2(a)(1) (unlawful employment practice "to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin"). This element may be satisfied by a showing of an actual or a constructive discharge. *See Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir. 1987); *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983).

### 1. *Whether Actual Discharge Issue is Reviewable*

■ An actual discharge, in the context of Title VII as in other contexts, occurs when the employer uses language or engages in conduct that "would logically lead a prudent person to believe his tenure has been terminated." *NLRB v. Trumbull Asphalt Co.,* 327 F.2d 841, 843 (8th Cir.1964) (Blackmun, J.); *see also NLRB v. Hale Mfg. Co.,* 570 F.2d 705, 708 (8th Cir.1978) (whether an employee has been discharged depends on the reasonable inference an employee could draw from what her employer said); *NLRB v. Ridgeway Trucking Co.,* 622 F.2d 1222, 1224 (5th Cir.1980) (same); *NLRB v. Hilton Mobile Homes,* 387 F.2d 7, 9 (8th Cir.1967) (same); *Liberty Mut. Ins. Co. v. NLRB,* 592 F.2d 595, 604 (1st Cir.1979) (*Hale* test generally accepted). Inquiry focuses on the reasonable perceptions of the employee, not on whether formal words of firing were in fact spoken. *See Ridgeway Trucking,* 622 F.2d at 1224; *Trumbull Asphalt,* 327 F.2d at 843.

Connecticut General maintains Chertkova waived the actual discharge argument by failing to present it to the district court. Concededly, plaintiff's filed papers did not clearly present the issue. Plaintiff did, however, draw the trial court's attention to evidence relevant to that issue. She pointed out that the evidence showed that the defendant engaged in a continuing course of conduct of taking adverse employment actions against her, beginning with negative performance evaluations, continuing with pre-probation and probation status, and ending in defendant's announced intention to terminate her employment.

■ Setting forth these facts should have sufficiently alerted the district court that the possibility of an actual discharge might have precluded summary judgment. Although we ordinarily will not review an issue the district court did not decide, whether we do so or not is a matter within our discretion. *See Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877–78, 49 L.Ed.2d 826 (1976). We think this case an appropriate one for exercising discretion to entertain the actual discharge argument. Based upon the materials presented in the parties' motion papers, the purely legal question of whether summary judgment was warranted with respect to the required showing of a discharge may be properly evaluated. *See Bornholdt v. Brady,* 869 F.2d 57, 68 (2d Cir.1989) (entertaining argument where district court's attention was directed to the facts pertinent to the argument and only legal questions were at issue); *Rebaldo v. Cuomo,* 749 F.2d 133, 137 (2d Cir.1984) (circumstances make it appropriate to entertain argument on appeal not raised below), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985).

### 2. *Merits of Actual Discharge Issue*

■ We decide now whether there exists a genuine factual question respecting actual discharge, an issue both parties argue on appeal. Plaintiff insists she was discharged when defendant made a final termination decision set forth in a letter to her dated March 6, 1992. She further declares that even if defendant did not officially discharge her, she was not welcome to return and did not return to her job. She maintains it is irrelevant that defendant continued to pay her disability benefits after she stopped going to work. Finally, she argues that defendant's letter dated August 16, 1994—prepared after this litigation commenced, and which she did receive—effected a discharge.

Although the March 6, 1992 letter clearly did not terminate Chertkova's employment when first prepared because it was not delivered to plaintiff, a reasonable jury might find an actual discharge occurred then. First, defendant does not adequately counter plaintiff's evidence suggesting that defendant led her to believe she was not welcome to return. Chertkova states that defendant ignored a claim for disability benefits made six months after she stopped coming to work, and that one of defendant's employees called her at home and asked her insulting questions relating to her symptoms, but was uninterested in discussing plaintiff's "working environment." Further, during this period Connecticut General turned aside plaintiff's efforts to reestablish communication with it.

These facts, along with the events preceding plaintiff's decision to leave—for example, the 1991 "coaching sessions" where O'Neil told her "You are not going to be here!" and Quirk's surreptitious solicitation of negative feedback in March 1992—lead us to conclude that a reasonable person in Chertkova's shoes might have thought she was in fact discharged after March 6, 1992, despite the fact that she had not received her official letter of termination. Defendant relies on proof indicating that plaintiff, after March 6, took advantage of benefits and programs available only to employees. But such evidence does not dispose of the issue of actual discharge. Assuming it is relevant to plaintiff's reasonable perceptions of defendant's actions and words, it simply suggests the issue is disputed. Moreover, the termination letter of August 16, 1994—although delivered after the litigation began—would clearly have effected a termination if the employment relationship had indeed lasted that long, a question that must be resolved by the factfinder.

The foregoing discussion makes clear that material issues of fact remain genuinely disputed. As such, to grant summary judgment would require a court to decide a disputed fact—something beyond its compass at this stage of the litigation. *See Gallo,* 22 F.3d at 1224. Thus, the question of whether Chertkova was actually discharged is not susceptible on this record to resolution by summary judgment.

### 3. *Constructive Discharge*

For similar reasons, we think summary judgment inappropriate with respect to the issue of constructive discharge. Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. *See Pena,* 702 F.2d at 325. Working conditions are intolerable if they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Lopez,* 831 F.2d at 1188 (quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)).

In the present case, Chertkova presented evidence sufficient to overcome a motion for summary judgment on the question of constructive discharge. That proof reveals plaintiff's working conditions were made intolerable by O'Neil, her supervisor, and by his boss, Craig May. O'Neil yelled at her in insulting terms during the coaching sessions purportedly aimed at improving her communication skills, telling her, "What do you hope for? Do you think you are going to outlive us? There is no chance! You are not going to be here!" He also told plaintiff she was "too expensive," and mocked her when she attempted to explain she was at the bottom of the pay range for her position.

In addition, plaintiff's proof allows the inference that she was treated arbitrarily and severely criticized despite her strong performance. A factfinder could infer, from the facts set forth in the affidavits and deposition testimony, that plaintiff was among the most competent employees in the Operations Engineering department and that although her interpersonal skills once left something to be desired, they had improved and were perfectly adequate. Further, although she had successfully completed probation, she was told she would be fired immediately if, over the course of two years, she did not maintain satisfactory performance levels, demonstrate satisfactory behavior, and improve her listening skills, which might be viewed as using her undoubted technical competence at work so long as she only listened and never spoke.

We recognize that a disagreement with management over the quality of an employee's performance will not suffice to establish a constructive discharge. *See, e.g., Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993). But here there is more than a disagreement over quality. Plaintiff's evidence suggests her supervisor engaged in a pattern of baseless criticisms, said she would not "be around," and that she would be fired instantly if she did not meet certain ambiguous behavior objectives. In *Lopez,* we held that telling plaintiff he would be fired following probation, "no matter what he did to improve his allegedly deficient performance," was sufficient alone to support a finding of constructive discharge. *See* 831

F.2d at 1188. Similarly, a reasonable person in Chertkova's position might have inferred from the circumstances, including the onslaught of unfounded criticism coupled with the threat of immediate termination, that she was compelled to leave.

An inference that the conditions were intolerable is further bolstered by the fact that plaintiff's former supervisor, Patricia Endweiss, was terminated for reasons similar to those that allegedly formed the basis for O'Neil's disapproval of plaintiff. Moreover, the timing of Chertkova's nervous breakdown—although the cause is disputed—suggests a connection between plaintiff's work conditions and her decision to leave. Although the factfinder ultimately may or may not decide that Chertkova reacted reasonably, a finding of constructive discharge would be supported by the fact that plaintiff had a breakdown on the day before her discharge letter was to be delivered.

The evidence, in addition, would also allow a factfinder to conclude that May and O'Neil *deliberately* created unbearable working conditions for the purpose of forcing Chertkova out of the company. One former employee—Melanie Konicki—stated in an affidavit that creating intolerable conditions to force unwanted employees to quit was a recognized practice of defendant's managers. Connecticut General dismisses this evidence as irrelevant because Konicki had no personal knowledge of how plaintiff was treated, but her statement lends support to plaintiff's theory that her supervisors—who were defendant's managers—engaged in such tactics. She was told nearly a year before the March 1992 termination letter that she would not survive there. Were the communication skills problems and other alleged performance deficiencies indeed concocted by May and O'Neil—a permissible inference based upon the evidence described above—a factfinder might further find that plaintiff's managers actively sought to compel her to resign.

The district court ruled that plaintiff's proffered proof of the following work conditions was insufficient to establish a constructive discharge: (1) her disagreement with her managers' evaluation of her work performance; (2) cold treatment by her supervi-

sors; (3) managers' failure to give her a performance award; and (4) that she was overworked. We think this summary of the evidence understates the severity of the conditions to which plaintiff claims she was subjected. Chertkova presented evidence indicating not only that she was treated coldly and arbitrarily, but also (among other things) that her supervisor yelled at her, told her she would not survive, and held over her like a sword of Damocles a threat of immediate termination.

It is true that if only one of the work conditions enumerated by the district court were present, it might not be enough to demonstrate constructive discharge. Certain factors, standing alone, are legally insufficient to support constructive discharge. *See, e.g., Stetson,* 995 F.2d at 360 (dissatisfaction with assignments; employee's perception of undue criticism or excessive monitoring; difficult or unpleasant conditions); *Pena,* 702 F.2d at 325 (disagreement with work plan). But the effect of a number of adverse conditions in the workplace is cumulative. A constructive discharge occurs if a reasonable person *subjected to the same conditions as the plaintiff* would have felt compelled to step down. Because a reasonable person encounters life's circumstances cumulatively and not individually, it was error to treat the various conditions as separate and distinct rather than additive. Viewed as a whole, the facts in the case at hand, if proven, would permit a finder of fact to conclude that Chertkova was forced to resign.

For all these reasons, and in view of our prior decisions holding that the plaintiff's burden of establishing a *prima facie* case in a discrimination suit is *"de minimis," see, e.g., Chambers,* 43 F.3d at 37, the district court's grant of summary judgment on the issue of constructive discharge may not stand.

### B. *No Requirement to Find Other Applicants*

We turn next to defendant's contention that the plaintiff must show that the defendant kept the position open after Chertkova's termination and continued to seek other applicants. Because it contradicts estab-

lished precedent, we decline to adopt this proposition. As noted earlier, in presenting a *prima facie* case of discriminatory discharge the plaintiff must present proof that her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class. *Chambers,* 43 F.3d at 37; *see also Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994); *Stetson,* 995 F.2d at 359. This fourth element of the *prima facie* case may be satisfied in a variety of ways.

The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, *see Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir. 1992), preferential treatment given to employees outside the protected class, *see Washington v. Garrett,* 10 F.3d 1421, 1434 (9th Cir.1993), and, in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees, *Gallo,* 22 F.3d at 1225, or a pattern of recommending the plaintiff for positions for which he or she is not qualified and failure to surface plaintiff's name for positions for which he or she is well-qualified, *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 205 (2d Cir.1995). A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, *Meiri v. Dacon,* 759 F.2d 989, 996 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), or, more generally, upon the timing or sequence of events leading to the plaintiff's termination, *Chambers,* 43 F.3d at 37.

As the cited cases make clear, there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision. Although the Supreme Court held in *McDonnell Douglas* that a *prima facie* case *may* include evidence that the position remained open and the defendant continued to seek applicants, it also noted that "[t]he facts necessarily will vary in Title VII cases, and the specification [in that case] of the *prima facie* proof required from respondent is not necessarily applicable in every respect to dif-

fering factual situations." *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Hence, contrary to defendant's assertion, the fourth element set forth in *McDonnell Douglas* is a flexible one that can be satisfied differently in differing factual scenarios.

Defendant avers that *Meiri* establishes that the viability of a discriminatory discharge claim depends upon evidence that the plaintiff's position remained open and that the employer continued to seek other applicants. But *Meiri,* a case in which the plaintiff claimed she had been terminated because of her religious beliefs, does not support such a rule. The district court had rejected a Title VII claim because the plaintiff had not been replaced by someone outside the protected class. *Meiri,* 759 F.2d at 994. Noting that such a requirement was too mechanistic and conflicted with the policies underlying Title VII, we held the appropriate inquiry should have been "whether the employer continued to seek applicants to fill the position." *Id.* at 996. As we made clear, however, this inquiry was appropriate only because although the employer sought a replacement, the position was eliminated before a replacement could be hired. Such circumstances were sufficient to support an inference of discrimination, and "[t]he fact that the position was ultimately eliminated" did not "sound a death knell to Meiri's Title VII claim." *Id.*

In addition, as *Meiri* stated, "[t]he elements of proof in employment discrimination cases ... were intended only to promote the general principle that a Title VII plaintiff must carry the initial burden of offering evidence adequate to 'raise[ ] an inference of discrimination.'" *Id.* (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978)) (alteration in *Meiri* ). Thus, it was error ritualistically to require Chertkova to present evidence that her position remained open and that the employer continued to seek other qualified applicants.

### C. Circumstances Supporting Inference of Discrimination

To complete her *prima facie* case, Chertkova only needed to show that her termi-

nation occurred under circumstances that give rise to an inference of discrimination. Plaintiff maintains the evidence was sufficient to permit such an inference. Defendant, relying on its argument that a Title VII case must include proof that the employer continued to seek other applicants, does not deny that plaintiff's proof is otherwise sufficient for a *prima facie* case. Instead, defendant maintains plaintiff cannot carry her ultimate burden of persuasion on the issue of whether the employer's proffered reason was pretextual.

In our view, defendant has waived any argument that summary judgment was properly granted to it because the circumstances to which plaintiff points did not raise an inference of discrimination. In any event, our resolution of the remaining question—whether plaintiff can carry her ultimate burden of persuasion—means that she successfully made the *de minimis* showing required to establish a *prima facie* case.

### III Pretext

■ The employer articulated a legitimate, nondiscriminatory reason for plaintiff's termination: her performance was deficient. Plaintiff does not dispute the district court's ruling that defendant satisfied its burden with respect to the second part of the *McDonnell Douglas* inquiry. Instead, she contends the district court erred in holding she would be unable, as a matter of law, to prove her employer's proffered motive was pretextual. "[T]o defeat a defendant's properly supported motion for summary judgment, a plaintiff must show that there is a material issue of fact as to whether (1) the employer's asserted reason for discharge is false or unworthy of belief *and* (2) more likely than not the [unlawful basis] was the real reason for the discharge." *Woroski*, 31 F.3d at 108–09 (citing *Hicks*, 509 U.S. at 515, 113 S.Ct. at 2751–52).

■ The district court reasoned that plaintiff failed to raise a genuine issue regarding pretext because a disagreement with the employer's performance appraisal is insufficient to show pretext, Connecticut General advanced substantial evidence of plaintiff's deficiencies, the employer had told plaintiff of her performance problems and had given her a chance to improve, and plaintiff's allegations of discrimination were conclusory. We think this rationale fails to draw the proper inferences and impermissibly resolves disputed factual issues.

Although plaintiff did advance some conclusory allegations, she also presented concrete evidence sufficient to permit a rational jury to conclude she was discharged because of her sex. To begin with, accepting as true plaintiff's description of May's interactions with her, a jury could conclude that his assessment of plaintiff was derived primarily from her being a woman rather than her professional abilities. Plaintiff charged that May consistently refused to discuss work-related matters with her, telling her stories of his personal dealings with women instead. And, while defendant insists these words and actions are gender neutral, we cannot agree. Although recounting one's personal life—or even using a term like "clotheshorse"—might under some circumstances be neutral, in this case such conduct might support an inference of gender bias. A factfinder could properly find that a department manager who avoids discussing business and limits his interactions with a female employee to discussions of his personal exploits—adding only a demeaning comment on her manner of dress— is likely to discriminate on the basis of that employee's gender.

Next, there is evidence that Patricia Endweiss, another competent woman in the department, was discharged in part because of poor communication skills, a reason similar to the one proffered by defendant for plaintiff's discharge. Connecticut General counters that Endweiss herself was not prepared to say in her deposition that her discharge resulted from her gender. This does not resolve the matter in defendant's favor because May's similar treatment of Endweiss may still bolster the conclusion that he treated women differently than men. Nor can the employer deny that Chertkova and Endweiss, along with one other woman, were the only people terminated in the department between the time May assumed control in mid–1990 and early 1993, after plaintiff was gone. Although (as the employer asserts) it

may be unlikely that May later terminated male employees simply to avoid the consequences of a discrimination suit, a jury could find that the sequence of the discharges, along with the reasons given and the other circumstances, evidenced gender bias.

Further, Cocolla had an opportunity to observe O'Neil's dealings with Chertkova directly, and apparently concluded that gender contributed to the failure of his coaching and to the offensive work conditions experienced by plaintiff, as shown by her sending plaintiff a copy of the book *You Just Don't Understand: Men and Women in Conversation.* Such evidence supports a finding that Chertkova's discharge resulted from her gender. Defendant's only response—that the book itself is not in the record—is inapposite.

Moreover, while O'Neil claims to have met with Chertkova on September 20, 1990 to discuss her purported deficiencies, and created a document memorializing such a meeting, Chertkova denies any such meeting ever took place. Accepting as true plaintiff's version, it is plausible that O'Neil was creating a record aimed at rationalizing plaintiff's termination. Plaintiff acknowledges that later meetings, reprimands, and coaching sessions were indeed held, but she presented enough evidence to justify the belief that her performance—including her conduct vis-à-vis management and her relations with customers—was wholly adequate or even superior. This evidence includes not only her own affidavit, but also affidavits and deposition testimony of other employees. That the proffered motive was a pretext is further supported by O'Neil's alleged threats at the coaching sessions, Quirk's rewrite at May's instigation of a formerly "excellent" evaluation, and the denial of plaintiff's request to attend a course on communication which she claims was available to all other employees.

The facts here are different from the "conclusory allegations of discrimination" relied upon in *Meiri,* 759 F.2d at 998 (referring to allegations that supervisor sought to eliminate plaintiff, that supervisor's view of plaintiff's work habits was infected by prejudice concerning her religion, and that plaintiff heard "disparaging remarks," where plaintiff admittedly could not "pinpoint people, times, or places"). Nor is this case like *Woroski,* 31 F.3d at 109, in which "the totality of the evidence overwhelmingly established a non-discriminatory motive." Taken together, the proof of bias is much stronger in the present case, and it precluded summary judgment. The evidence amply supports our view that a factfinder could believe Chertkova lost her job because she is a woman.

In addition, contrary to defendant's suggestion that the evidence of performance deficiencies was overwhelming, a jury could reasonably conclude that this proffered reason was pretextual. Chertkova was concededly professionally and technically highly competent. She presented proof that documenting a pattern to get rid of an unwanted employee was a recognized practice at the company and the evidence suggests May, O'Neil, and Quirk may have done exactly that in her case.

## CONCLUSION

Accordingly, we reverse the district court's grant of summary judgment and remand for proceedings not inconsistent with this opinion.