Leona McCULLEY

v.

**SOUTHERN CONNECTICUT NEWSPAPERS, INC.**

No. 3:96CV1274(RNC).

United States District Court, D. Connecticut.

March 29, 2000.

Leona McCulley, pro se.

Kevin O'Leary, Cummings & Lockwood, Hartford, CT, for Defendant.

CHATIGNY, District Judge.

After review and absent objection, the recommended ruling is hereby approved and adopted.

### RECOMMENDED RULING

MARTINEZ, United States Magistrate Judge.

Pending before this court is the defendant Southern Connecticut Newspapers' Motion for Summary Judgment (doc. # 81). The undersigned recommends that the motion be GRANTED in part and

DENIED in part for the reasons that follow.

### I. *PROCEDURAL HISTORY*

The plaintiff's *pro se* complaint sounds in three counts. In the first count, she alleges that her race and gender were motivating factors in the defendant's failure to promote her. In her second and third counts, she claims that the defendant withheld her short term disability benefits and terminated her in retaliation for filing discrimination complaints with the U.S. Equal Employment Opportunity Commission ("EEOC") and the State of Connecticut Commission on Human Rights and Opportunities ("CHRO").

On August 6, 1999, the defendant filed a motion for summary judgment urging this court to grant judgment in its favor on all three counts. On August 30, 1999, the plaintiff filed an opposition to the motion for summary judgment.[1]

### II. *FACTS*

The plaintiff, an African American woman, was employed by *The Advocate,* a daily newspaper in Stamford owned by the defendant Southern Connecticut Newspapers, Inc. The defendant hired the plaintiff in 1984 as a part-time driver. (Doc. # 83, ¶ 1). Her responsibilities included "delivering newspapers to racks," training other drivers, "covering shorts" and making "bundle drops." (Doc. # 83, ¶ 2).

In 1986, the plaintiff made allegations of gender discrimination against *The Advocate* and claimed that similarly situated

---

1. In considering this motion for summary judgment, the court is mindful that the plaintiff is proceeding *pro se.* The court has read the pleadings as well as the plaintiff's other submissions in a liberal manner and construed them in the manner most favorable to the plaintiff. *See, e.g., Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

   In response to the motion for summary judgment, the plaintiff submitted a Local Rule 9(c)2 statement (doc. # 89); a Statement of Material Facts as to Which There Can Be No Dispute (doc. # 87) and an affidavit (doc.

   # 88). Appended to her affidavit are a number of documents which she apparently obtained during discovery. Finally, she submitted two memoranda (doc. 86, 92). Although the plaintiff's submissions are in some places inartful, the court is persuaded that she understands the summary judgment process. *See Vital v. Interfaith Medical Center,* 168 F.3d 615, 620–21 (2d Cir.1999)(district courts must be sure that a *pro se* litigant is aware of obligations during the pendency of a motion for summary judgment as well as the possible consequences of the motion).

males were paid more than females. The CHRO investigated the complaint and determined that there was insufficient evidence to substantiate the claims. (Doc. # 83, ¶¶ 3, 4).

In January 1994, the plaintiff applied for a full-time motor route driver position. (Doc. # 83, ¶ 5). Her supervisor, Gary Edwards, awarded her the position. It was considered a promotion from her part-time position. (Id.) As a full-time driver, the plaintiff reported for work at 9:00 a.m. and left about 1:30 p.m. (Doc. # 83, ¶ 6). She also had to work from 4:00 a.m. until about noon on Saturdays and Sundays. (Doc. # 87, ¶ 2).

During the same period of time that the plaintiff was employed by *The Advocate* as a full-time driver, she also worked for the Laidlaw Bus Company. (Doc. # 83, ¶ 6).

In the early months of 1995, another full-time motor route driver position became available. (Doc. # 83, ¶ 10). The plaintiff told her supervisor that she would be interested in the position if it meant an increase in pay and a day off. (Doc. # 83, ¶ 12).

On January 23, 1995, the defendant posted a notice concerning this position. The notice stated that a full-time motor route position was open and that the defendant was accepting applications for the position. The notice described the position as follows, "Responsibilities will include: delivering a motor route every day, removing and installing tubes, filling in for other drivers, and assisting supervisors with managing district while off." (Doc. # 83, ¶ 11). The job requirements were described as follows:

> Must be a dependable individual available to work a 7–day work week. Must be able to lift bundles up to 50 pounds and be able to install and remove tubes. Must have valid driver's license. Must be able to work well under pressure and assume responsibilities on short notice. Hours will vary between 4:00 a.m. to noon weekdays, and 3:00 a.m. to noon on weekends. WEEKENDS WILL BE REQUIRED.

(Doc. # 88, Tab B, p. 4). The notice also stated that a "preferred candidate" was being considered but that qualified employees were nevertheless encouraged to apply. (Id.) The notice did not indicate the pay rate for the position. (Id.)

The defendant has a policy that allows it to pre-select a "preferred candidate" for a position. The policy provides that

> if there is a preferred candidate for a position or if a position has been created for a particular employee, the job posting will state that there is a preferred candidate. A preferred candidate is one who through position, training and/or experience is well qualified. The preferred candidate may be a current employee or an outside candidate.

(Doc. # 88, Tab B, p. 1).

Before the notice describing the job opening was posted, Richard Nevers, an African American man, was identified as the preferred candidate. At that time, Mr. Nevers was employed by the defendant as a part-time driver. (Doc. # 83, ¶ 19–20).

The plaintiff applied for the posted position. On her application, she wrote, "can work hours." (Doc. # 88, Tab B, p. 6). She and Mr. Nevers were interviewed and considered for the position. On January 30, 1995, Mr. Nevers was selected. (Doc. # 83, ¶ 17; Doc. # 88, Tab B, p. 7). Both before and after Mr. Nevers received the new position, he was paid $8.70 per hour. The plaintiff was paid $11.10 per hour during the same time period. (Doc. # 83, ¶ 20; Doc. # 84, Tab C, Ex. C).

In or about April 1995, the plaintiff filed another complaint with the CHRO alleging discrimination. She asserted that the defendant discriminated against her in failing to offer her a promotion,[2] that is, in failing

---

2. The defendant disputes that the full-time motor route position was a promotion. *See,* *infra* at 222–23.

to give her the position that was filled by Mr. Nevers. Specifically, she claimed that the she was discriminated against based on her race and gender. (Doc. # 83, ¶ 22).

During the relevant time period, the defendant employed ten full-time motor route drivers, including the plaintiff and Mr. Nevers. Three of the ten were African American women. (Doc. # 83, ¶ 21).

On July 30, 1995, the plaintiff received a favorable performance evaluation as well as an increase in her salary. (Doc. # 83, ¶¶ 26–27; Doc. # 84, Ex. E).

In September of 1995, the plaintiff requested short term disability benefits. (Doc. # 82, ¶ 23). The defendant did not pay the benefits right away. It explains that there was a delay while the defendant awaited medical documentation to substantiate the plaintiff's claims. (Doc. # 84, Tab C). The defendant began paying the benefits on September 27, 1995. (Doc. # 84, Tab D).

In November 1995, the plaintiff filed another complaint with the CHRO, this time alleging that the defendant withheld the short term disability benefits for a retaliatory purpose. (Doc. # 83, ¶ 24).

On February 10, 1996, the plaintiff had an argument with a co-worker, Carolyn Heard. The State of Connecticut Department of Labor Employment Security Appeals Division described the incident as follows:

> The [plaintiff] was involved in an incident in the employer's parking lot on February 4, 1996, in which she had blocked two other employee vehicles from exiting or entering the facility. One of these coworkers, Roseann Reggiano, got out of her vehicle and asked the [plaintiff] to move the company van so she could exit the employer's facility and begin her own route. The [plaintiff] believed that, in requesting the [plaintiff] to move her vehicle, Reggiano called the [plaintiff] a black bitch, but the [plaintiff] could not verify that Reggiano had done so. The [plaintiff] asked the other

employee, Carolyn Heard, if she had heard Reggiano call her a black bitch. Heard told the [plaintiff] that she had not heard Reggiano use this term, that the [plaintiff] "should drop it," and that Heard did not want to get involved in the incident. The [plaintiff] went to her manager, Gary Edwards, to complain about Reggiano's alleged comment. Edwards investigated the incident, which included talking to Reggiano and Heard, who both denied that the comment was made. When the [plaintiff] later asked Edwards the results of his investigation, he told her that Reggiano and Heard had denied the comment was made and that the matter should be dropped.

> On February 7, the [plaintiff] approached Heard and started to argue with her about the incident and Heard's failure to take the [plaintiff]'s side against Reggiano. Heard testified that the [plaintiff] was "like a crazy person," that she was upset and talking loudly. Heard subsequently spoke to Edwards and asked him to tell the [plaintiff] to leave her alone. In response, Edwards brought the [plaintiff] into his office and warned her that she should cease discussing the incident of February 4 with Heard.

(Doc. # 88, Tab D, p. 16).

Nevertheless, on February 10, 1995, the plaintiff approached Ms. Heard while she was delivering papers on her route. (Doc. # 83, ¶ 28). Ms. Heard complained to the police that as she drove up to a customer's house, the plaintiff drove alongside Heard and asked Heard whether she had called the plaintiff's house and told the plaintiff "to leave her alone." The women exchanged words and Heard drove away. (Doc. # 84, Ex. G).

Ms. Heard told Gary Edwards what happened. She was very upset. Edwards met with the plaintiff, discussed the incident and told her to leave for the day. The plaintiff asked if she was fired. Edwards replied, "not necessarily." He placed the plaintiff on paid leave until the

matter could be further investigated and resolved. Although the plaintiff did not work that weekend, she was paid her full salary. (Doc. # 84, Tab D).

Shortly after his discussion with the plaintiff, Edwards learned that the plaintiff had called the police. When the police arrived, the plaintiff complained that Edwards had shoved her. (Doc. # 87, ¶ 20). Edwards denied the plaintiff's allegations. (Doc. # 84, Tab D).

> Edwards found that the plaintiff had verbally abused Ms. Heard after being specifically directed not to have contact with her. This behavior constituted not only unacceptable abuse, but also insubordination. In addition, [he] concluded that Ms. McCulley engaged in dishonesty, specifically in the police report regarding [his] conduct. Finally, [he] concluded that [the plaintiff] had engaged in inappropriate conduct on company property and while using the company van, including using offensive language and attempting to engage a co-worker in an altercation.

(*Id.*) Edwards determined that the plaintiff had engaged in misconduct and terminated her employment.

The evidence before the court also reveals that another *Advocate* employee, a white male, was accused of a number of instances of misconduct. His misconduct ranged from carelessness to racial and sexual harassment and spanned several years. (Doc. # 88, Tab C, Ex. D). He was disciplined progressively. The evidence begins with a written warning; with each successive instance of misconduct, there were more severe consequences. Finally, after the fifth instance, he was terminated. (*Id.*) The evidence does not reveal the same type of progressive discipline for the plaintiff.

## III. STANDARD OF REVIEW

A party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Summary judgment is not appropriate where, based on the evidence, a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the burden of showing the absence of any genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### A. Burden–Shifting Paradigm

At the summary judgment stage of an employment discrimination case, a plaintiff must first establish a *prima facie* case by a preponderance of the evidence. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (discussing burden shifting paradigm); *Chertkova v. Connecticut General Life Ins.,* 92 F.3d 81, 86–87 (2d Cir.1996) (discussing burden shifting under Title VII); *Fisher v. Vassar College,* 70 F.3d 1420, 1433 (2d Cir.1995)(same). This burden is "minimal." *Bickerstaff v. Vassar College,* 196 F.3d 435, 446 (2d Cir. 1999). If the plaintiff is successful in establishing a *prima facie* case, a presumption of unlawful discrimination arises. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996).

Once the plaintiff establishes a *prima facie* case, the burden of production then shifts to the defendant, who must rebut the presumption by articulating a legitimate, non-discriminatory reason for its action. *See id.* This burden is also slight; the defendant need do no more than offer an explanation. *See id.* If the defendant meets this burden, the presumption raised by the plaintiff's *prima facie* case is rebutted and it drops from the case. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "The plaintiff then has the oppor-

tunity to demonstrate that the proffered reason was not the true reason for the employment decision and that race [and/or gender] was." *Bickerstaff*, 196 F.3d at 446. This opportunity "now merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Id.*

### B. *Race and Gender Discrimination Claims*

In her first count, the plaintiff contends that the defendant discriminated against her on the basis of her race and gender when it failed to give her the full-time motor route driver position she applied for in January, 1995. The defendant asks the court to grant summary judgment in its favor on this count because it claims that the undisputed facts show that the plaintiff cannot establish a *prima facie* case of discrimination.

■■■ To establish a *prima facie* case under Title VII, a plaintiff must show that (1) she is a member of a protected class, (2) she is qualified to hold the position, (3) she suffered an adverse employment action, and (4) the adverse action occurred under circumstances that give rise to an inference of discrimination. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152–153 (2d Cir.1998). In order to establish this fourth element, the plaintiff must show that she was treated differently from similarly situated employees outside of her protected class. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

For purposes of this motion for summary judgment, the defendant concedes that the plaintiff is a member of a protected class and that she was qualified for the position of full-time motor route driver. *See* doc. # 82, pp. 13–14. The defendant maintains, however, that there is no genuine issue of material fact as to whether the plaintiff suffered an adverse employment action.

■■■ A plaintiff sustains an adverse employment action if she suffers a "materially adverse change" in the terms and conditions of employment. *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir.1999). To be materially adverse, the change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* An employment action may also be adverse if "it results in a change of responsibilities so significant as to constitute a setback to the plaintiff's career." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640–41 (2d Cir.2000). An adverse employment action will be found where a plaintiff applies for a specific promotion and is rejected for a discriminatory reason. *See Brown v. Coach Stores*, 163 F.3d 706, 710 (2d Cir. 1998).

■■■ The defendant submits that the full-time motor route position was not a promotion. It explains that at the time the plaintiff applied for the new job, she was already employed as a full-time motor route driver and had the same responsibilities as the new position; therefore, the defendant argues, the position would have been only a lateral transfer. In addition, the defendant argues, when Mr. Nevers received the position, he was paid a wage substantially lower than that which the plaintiff was paid.

The plaintiff, on the other hand, maintains that "the actual position was an Assistant Supervisor and the [defendant falsely] writes the name of the job position

to discourage other people from appl[y]ing so that he can give it to who ever he wants to." In support of this statement, the plaintiff directs the court to pages 7 through 15 of Tab B, Doc. # 88. The court has carefully reviewed these documents and finds that they do not support the plaintiff's conclusory allegation that the position was a promotion.[3] At best, they show that some full-time motor route drivers fulfilled some supervisory duties while the motor route manager was on maternity leave. *See e.g.* Doc. # 88, Tab B., pp. 9–10. "Statements that are devoid of specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff,* 196 F.3d at 452.

3. Page 7 is a Status Change Form dated January 4, 1995 that relates to Richard Nevers. It states that Mr. Nevers was promoted from part-time driver to full-time motor route driver on January 30, 1995 at the same rate of pay.

   Page 8 is another Status Change form. It indicates that Richard Nevers was promoted again on February 17, 1997. He was promoted from full-time motor route driver to a managerial position. (This promotion is not the focus of the plaintiff's complaint.)

   On page 9 is a copy of a memorandum from Gary Edwards to the Stamford Motor Route Division dated November 1, 1995. It states that "[e]ffective immediately, Christine Jones will begin helping Richard Nevers supervise the Stamford Motor Routes until Debbie returns to work."

   Page 10 is a copy of the August 1995 "Inside Edition" which is "A Newsletter for Advocate and Greenwich Times Employees." Handwritten on the first page is the following notation:

   "My supervisor was fired after me[.] Tim Mann took her place on March 6, 1996[.] Deborah Schmidel was fired[.] They did fight her unemployment either."
   The plaintiff also highlighted the following:
   Tim Mann, Motor Route Driver, began working for our company in January 1994 but is a seasoned newspaper carrier with almost six years of experience. Tim was nominated for his superior performance in June when he covered for his supervisor, Christine Jones, while she was out on maternity leave. Tim was quickly trained in all aspects of her job which included learning 13 district motor routes, the department computer system, and several daily reports.

The plaintiff fails to show that she suffered an adverse employment action. She fails to establish that the position which she sought was a promotion or that she received a demotion, a decrease in wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities. There is no indication that there was a significant change in her responsibilities or that she endured a setback to her career.

■ Although the plaintiff's burden of establishing a *prima facie* case of discrimination is slight, *see Chertkova,* 92 F.3d at 87, the plaintiff in this case has failed to put forward evidence that satisfies this *de minimis* standard.[4]

   Gary Edwards says that, "Tim did an excellent job on all of the above, in addition to following through on any problems. A motor route manager's success can be measured with a delivery per complaint ratio for the district."
   Page 11 is a copy of a page entitled "Welcome Aboard." The plaintiff circled "Motor Route Driver" next to Tim Mann's name.

   Page 12 is an original of a handwritten and undated note that says, "Rich/Chris See me to discuss an 'RDBA'". It is signed "L." The plaintiff does not explain the significance or the meaning of this note.

   Page 13 is a copy of a right to sue letter dated September 10, 1996.

   Page 14 is mostly illegible, but the bottom portion reads, "Leona Good work!! This customer called to compliment you on your good, on time. delivery service. She is very happy with you!!" It is signed, "Gary."

   Page 15 is a letter from a customer to the Office Manager of the Circulation Department at *The Advocate* complimenting the plaintiff on a job well done.

4. The plaintiff also fails to establish proof giving rise to an inference of racial or gender discrimination. Although the court's determination that the plaintiff failed to show she suffered an adverse employment action is dispositive of the plaintiff's first count, this point is worthy of brief discussion.

   A primary method by which a court can infer discriminatory animus is if the person who received the sought after position was not a member of the plaintiff's class. *See Harmon v. Runyon,* No. 96 Civ. 6080, 1997

## C. Retaliatory Denial of Benefits Claim

■ Title VII retaliation claims are governed by the same legal framework as discrimination claims. In order to establish her *prima facie* case of retaliation, the plaintiff must show that (1) she participated in a protected activity; (2) the defendant was aware of her participation in the activity; (3) she endured an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993).

■ In count two of her amended complaint, the plaintiff alleges that the defendant retaliated against her when it denied her request for short term disability benefits. The defendant asks that the court grant summary judgment in its favor on this count because the plaintiff cannot establish a causal connection between the filing of her complaint and the denial of benefits. Specifically, the defendant contends that the plaintiff cannot prove the nexus because the undisputed facts show that the defendant paid the benefits to the plaintiff two weeks before she filed the complaint which alleged that the benefits were withheld for a discriminatory purpose. The defendant's argument lacks merit.

■ The defendant correctly states that where the claimed retaliatory act occurs before the plaintiff engaged in the protected activity, the plaintiff cannot establish the factual connection. *See DuBois v. New York*, 966 F.Supp. 144, 148 (N.D.N.Y. 1997). Although it is true that the plaintiff did not file her discrimination claim alleging that the defendant withheld her benefits for a retaliatory purpose until after she began receiving benefits, the defendant's argument is flawed. The defendant fails to acknowledge that the plaintiff filed a number of discrimination claims before she filed her application for short term disability benefits. These earlier complaints of discrimination are adequate evidence, at this stage of the case, to show a causal connection between the complaints and the later delay in benefits. Therefore, summary judgment is not proper.

## D. Retaliatory Termination Claim

In the third count of her operative complaint, the plaintiff alleges that the defendant terminated her employment in retaliation for her filing of discrimination complaints with the CHRO and EEOC. The defendant asks the court to grant summary judgment in its favor on this count because, it maintains, the plaintiff cannot show a causal connection between the filing of the complaints and the adverse employment action. It maintains that the plaintiff last filed a charge of discrimination in April 1995 and was not terminated until almost a year later in February 1996.

■ The defendant's recitation of the facts is incorrect. The record is clear that the plaintiff filed a complaint alleging discrimination in November 1995, only 3 months before she was terminated. The proximity in time between these two events is sufficient to establish the causal connection. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995)(causal connection found where the plaintiff was ter-

WL 786383 (S.D.N.Y. Dec. 19, 1997) (plaintiff failed to show that she was treated differently from similarly situated employees outside her class where three other members of her class were not subjected to same adverse employment action); *Samuels v. New York State Dept. of Correctional Servs.*, No. 94 Civ. 8645, 1997 WL 253209 (S.D.N.Y. May 14, 1997)(black female plaintiff failed to establish an inference of racial discrimination where

two out of four promotions she complained of were given to black males). The fact that the position which the plaintiff sought was filled by a member of her same protected class undercuts her claim of racial discrimination.

Moreover, the plaintiff fails to offer any evidence that she was treated differently because she is a woman. Indeed, the defendant offers evidence that three of the ten motor route drivers were women.

minated three months after making a complaint of sexual harassment).

Next, the defendant argues that it is entitled to summary judgment because it offered a legitimate, nondiscriminatory reason for terminating the plaintiff and the plaintiff failed to demonstrate that the reason was both false and that discrimination was the real reason. *See* doc. # 82, p. 28, citing *St. Mary's*, 509 U.S. at 515, 113 S.Ct. 2742.

■ Contrary to the defendant's assertion, the plaintiff need not prove that the defendant's proffered reason was false and that discrimination was the real reason that she was terminated. Rather, the plaintiff need only show that retaliation was a motivating factor in the decision to terminate her employment. The Second Circuit recently explained the source of this confusion:

> Though there are sentences in some opinions to the effect that a Title VII plaintiff must prove "both that the [defendant's proffered reason] was false and that discrimination was the real reason," *St. Mary's*, 509 U.S. at 515, 113 S.Ct. at 2752, these decisions do not require a finding of [falsity] in addition to a finding of discrimination; they make quite the different point that a Title VII plaintiff may not prevail by establishing only [falsity], but must prove, in addition, that a motivating reason was discrimination. *See id.* at 511[, 113 S.Ct. 2742].... The opportunity presented to the plaintiff under the paradigm—to show the employer's proffered reason false—is designed simply to sharpen the inquiry into the elusive factual question of intentional discrimination. The consequence of a plaintiff engaging this opportunity and demonstrating falsity is that it may (and, in most circumstances, will) advance her greater enterprise of showing discriminatory intent. Thus properly understood, as the paradigm hones and sequentially narrows the factual inquiry, it extends to the plaintiff the opportunity

to demonstrate that the proffered reason was false, as one means to support her ultimate burden of proving discrimination.

*Bickerstaff*, 196 F.3d at 447 (citations and internal quotation marks omitted). Put another way, "[t]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

■ Application of the paradigm to the instant case reveals that the plaintiff has established her *prima facie* case of retaliation and the defendant has satisfied its burden of production by proffering a legitimate reason for terminating the plaintiff's employment. The court must then determine whether the plaintiff has presented sufficient evidence from which a rational trier of fact could infer that she was the victim of retaliation. *See Bickerstaff*, 196 F.3d at 447. In making this determination, the court must consider the evidence as a whole and not in a piecemeal fashion. *See id.* at 448.

The court concludes that the plaintiff has offered sufficient evidence to support an inference that retaliation was a motivating factor in the defendant's decision to terminate her employment. A rational jury could credit the evidence that she was terminated only three months after filing her last complaint. In addition, the jury could infer retaliation from the evidence that shows the plaintiff suffered a more severe form of discipline than at least one other employee who was accused of engaging in serious misconduct. These circumstances are sufficient to defeat the defendant's motion for summary judgment.

## IV. *CONCLUSION*

The Defendant's Motion for Summary Judgment should be **GRANTED** as to

Count One and DENIED as to Counts Two and Three.

Either party may seek the district judge's review of this recommendation. See 28 U.S.C. § 636(b)(written objections to ruling must be filed within ten days after service of same); Fed.R.Civ.P. 6(a), 6(e) 7 72; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992)(failure to file timely objection to Magistrate Judge's recommended ruling waives any further review of the ruling).

March 10, 2000.