DECISION AND ORDER
 

 LARIMER, Chief Judge.
 

 This discrimination case is brought pursuant to the Age Discrimination in Employment Act (“ADEA”), 29 U.S.C. § 621,
 
 et seq.;
 
 the Employee Retirement Income Security Act of 1974 (“ERISA”), 29 U.S.C. § 1001
 
 et seq.;
 
 and the New York Human Rights Law (“NYHRL”), N.Y.Exee. Law § 290
 
 et seq.
 
 Negligent and/or intentional infliction of emotional distress claims are also asserted.
 

 Plaintiff Donald B. Kerber (“Kerber”) was terminated from his employment with C.J. Winter Machine Works, Inc. (“CJW’) when he was 56 years old. Kerber claims that he was wrongfully terminated because of his age. Defendants assert that Kerber was terminated due to unsatisfactory work performance.
 

 Presently before me is defendants’ motion for summary judgment dismissing all of Kerber’s claims. For the reasons set forth below, the motion is granted.
 

 FACTUAL BACKGROUND
 

 Kerber was employed by CJW from 1971 until his termination on July 27, 1993 (22 years). He started as a draftsman/designer and at the time of his termination had been working as a “threadroll engineer” for several years.
 

 Defendants assert that Kerber was always a marginal employee. Kerber’s job performance was evaluated annually. Performance evaluations from 1980, 1984, 1985, and 1986 indicated that Kerber’s performance was generally average. Defendants’ Motion for Summary Judgment (“Defs’ Motion”), Exs. F-I. Kerber’s strengths were identified as “dependability to perform repeat engineering exercises and functions” (1985). Weaknesses were identified as “ability to organize work schedule and meet goals”, “lack of ambition” (1980); “need to develop more ambitious work habits and attitude” (1984); and “low initiative, and project planning ability” (1985).
 
 Id.
 

 Starting in 1987, Kerber’s supervisor was defendant Britt Carpenter (“Carpenter”). Carpenter’s first evaluation of Kerber (1987) indicated fair to average performance generally. Defs’ Motion, Ex. J. Carpenter noted that Kerber’s major strengths were a “good technical understanding of his job” ... [and that he] is also a “very dependable & persistent employee.” Weakness were that Kerber “lacks initiative and insight to 1) ensure timliness [sic] of orders and documentation, 2) anticipate and communicate problems, and 3) follow up with solutions.”
 
 Id.
 

 Carpenter’s 1988,1989,1990 and 1992 evaluations indicated an “acceptable” rating of overall performance. Defs’ Motion, Ex. K. These evaluations contain some positive statements — i.e., that Kerber’s timeliness had been converted from a weakness to a strength (1988) and that his knowledge of threadrolls continued to be a valuable asset to the company (1989, 1990). But they also identify ongoing weaknesses — i.e., still needs
 
 *217
 
 to improve ability to anticipate, evaluate and resolve problems (1988).
 
 Id.
 

 Carpenter asserts that he was never happy with Kerber’s work but that, before 1992, he felt the best way to promote improved performance by Kerber was to offer encouragement. Affidavit of Britt Carpenter (“Carpenter Afft”) at ¶ 7. In 1992 Carpenter allegedly grew more frustrated with Kerber’s poor performance, especially compared to other engineers who were doing considerably more work than Kerber.
 
 Id.
 
 at ¶ 8. Other employees allegedly began to complain about Kerber’s lack of responsiveness, failure to perform work on a timely basis, and errors.
 
 Id.
 
 at ¶ 6.
 

 Carpenter asserts that at various times throughout 1992 he assigned a variety of projects to Kerber.
 
 [1]
 
 With one possible exception, it appears that Kerber failed to work on any of them during the entire year.
 
 [2]
 
 Kerber Deposition at pp. 97-98.
 

 On January 22, 1993, Carpenter discussed the outstanding projects with Kerber. Carpenter again discussed the projects with Kerber on two occasions in February 1993 and was told by Kerber that he hadn’t had a chance to work on them. Kerber Deposition at 99,103. Carpenter alleges that he emphasized to Kerber the importance of getting the projects finished. Carpenter Afft at ¶ 16. Kerber asserts that Carpenter merely “asked me how I was doing on them.” Kerber Deposition at pp. 98, 99,100,103.
 

 On February 9, 1993, Carpenter issued a written Employee Warning Notice to Kerber. The Warning was based upon “unsatisfactory work quality.” Defs’ Motion, Ex.L. It stated that Kerber had failed to perform tasks assigned 8 months earlier, despite several discussions about the importance of completing them. The Warning Notice further stated that Kerber’s work frequently had mistakes, and that it took him eonsiderably longer than his peers to accomplish the same tasks. Finally, the Notice reiterated a prior verbal warning that “a lack of immediate corrective action by [Kerber] to solve his productivity problems will result in termination.”
 
 Id.
 

 Kerber indicated disagreement with the assessment. He wrote on the Warning Notice form that “I did not think I was wasting any time in doing my job, also thread roll orders are checked for any errors.”
 
 Id.
 

 On days when Kerber was absent, another engineer would cover for him. According to Carpenter, this other engineer (Paul Allart) did Kerber’s daily job in 2 to 3 hours, leaving Allart the rest of the day to do his own work. Carpenter Afft at 1123. Kerber asserts that Allart did only the easiest parts of his job— leaving the more complex parts for him.— and that Allart’s work was full of errors. Kerber Afft at ¶¶ 22,23.
 

 Because Kerber’s timeliness was one of Carpenter’s concerns, Carpenter sought to determine more specifically how much time Kerber was spending on each task. Carpenter asked Kerber to provide this information but he allegedly found Kerber’s report so messy and confusing that it was impossible to decipher. Carpenter Afft at ¶ 22. Accordingly, on two occasions in March 1993, Carpenter went to Kerber’s work station and, with a stop watch, timed how long it took for Kerber to perform certain tasks.
 
 Id.
 
 at ¶ 26. Carpenter determined that Kerber was inflating the amount of time he estimated to complete the tasks.
 
 Id.
 

 During the period between February 1993 and July 1993, Kerber was assigned and completed a few additional projects. He also completed some of the projects assigned in 1992. Defs’ Motion, Ex. 0; Kerber Deposition at pp. 79-103.
 

 In June 1993, Kerber received from Carpenter a performance evaluation from Car
 
 *218
 
 penter in which his rating of overall performance was “below average.” Defs’ Motion, Ex P. Kerber was also ranked “below average” in the areas of accuracy, ability to understand and follow directions, quantity of work, quality of work, organization, and care in appearance. Carpenter commented that Kerber “averages over 7 hrs/day on routine tasks that should take only 3 to 4 hours.” Carpenter further indicated that Kerber doesn’t spend enough time on assigned projects. Finally, Carpenter noted that “organization and upkeep of Don’s tasks, documentation & work area is very inefficient____” The evaluation stated that “significant improvements are mandatory.”
 
 Id.
 

 Kerber submitted a written response to the evaluation, disputing the criticisms and noting,
 
 inter alia,
 
 that he had worked at CJW without incident for 22 years, and for Carpenter specifically for 5 years, and that only recently had Carpenter become concerned with these performance issues. Kerber further asserted that prior to the performance evaluation he had begun organizing a filing system for manuals and data sheets. Defs’ Motion, Ex. P.
 

 Carpenter prepared written comments to Kerber’s response. He defended his relatively recent criticism of Kerber as follows:
 

 “It is true ... that I have not been consistent in my criticism of Don---- I came to the conclusion, rightly or wrongly, that he was incapable of much improvement. It just didn’t make sense to criticize those weaknesses which, in my mind, he was unable to improve. It got to the point, however, that I could no longer tolerate this very weak link within an otherwise strong Engineering Department.” Defs’ Motion, Ex. Q, p. 1.
 

 As for Kerber’s assertion that he had begun to organize a filing system, Carpenter wrote “[t]his was done only after his peers became extremely frustrated with the archaic and wasteful methods Don used.”
 
 Id.
 
 at p. 3.
 

 Based upon Kerber’s response to his June 1993 performance evaluation, Carpenter determined that Kerber did not perceive any problem with his performance and would not make the necessary effort to improve. Carpenter Affit at ¶ 31.
 

 Kerber was terminated on July 27, 1993. Subsequently, his job was absorbed by Paul Allart and one other employee (both of whom were significantly younger than Kerber). No new person was hired to replace Kerber. Defendants allege that by 1994, computer technology made Kerber’s job totally obsolete.
 

 DISCUSSION
 

 A.
 
 Summary Judgment Standards:
 

 Pursuant to Fed.R.Civ.P. 56(c), a moving party is entitled to a judgment as a matter of law if there is “no genuine issue as to any material fact” and where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.
 
 See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact.
 
 Celotex Corp. v. Catrett, 477
 
 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party “must do more than simply show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita, supra,
 
 475 U.S. at 586, 106 S.Ct. at 1356. “[T]he non-moving party must come forward with ‘specific facts showing that there is a genuine issue for trial.’ ”
 
 Id.
 
 at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) (alteration in original)). However, at the summary judgment stage, when perusing the record to determine whether a rational fact-finder could find for the non-moving party, all reasonable inferences must be drawn in favor of the non-moving party.
 
 See Murray v. National Broadcasting Co.,
 
 844 F.2d 988, 992 (2d Cir.),
 
 cert. denied,
 
 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).
 

 The general principles underlying a motion for summary judgment apply no less to this action simply because it is an employment discrimination case. It is true that courts exercise caution when considering whether to grant summary judgment in cases where an employer’s intent is at issue.
 
 See, e.g., Gallo v. Prudential Residential Servs.,
 
 
 *219
 
 22 F.3d 1219, 1224 (2d Cir.1994). However, “summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact.”
 
 Chambers v. TRM Copy Centers Corp.,
 
 43 F.3d 29, 40 (2d Cir.1994). For a plaintiff in a discrimination case to survive a motion for summary judgment, he must do more than present “conclusory allegations of discrimination,”
 
 Meiri v. Dacon,
 
 759 F.2d 989 (2d Cir.)
 
 cert. denied,
 
 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); he must offer “concrete particulars” to substantiate the claim.
 
 Id., cited in Duprey v. Prudential Ins. Co.,
 
 910 F.Supp. 879 (N.D.N.Y.1996).
 

 B.
 
 Summary Judgment Analysis in ADEA Cases:
 

 The ADEA provides that it “shall be an unlawful for an employer ... to discharge any individual ... because of such individual’s age.” 29 U.S.C. § 623(a)(1). Specifically, this law applies to individuals who are at least forty years of age. 29 U.S.C. § 631(a).
 

 When analyzing a summary judgment motion in an ADEA case based upon circumstantial evidence, courts apply the same analytical framework applied in Title VII and other discrimination cases.
 
 [3]
 
 This three step framework was first set forth in
 
 McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined by
 
 Texas Dep’t of Community Affairs v. Burdine,
 
 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
 
 See Viola v. Philips Medical Systems of North America,
 
 42 F.3d 712 (2d Cir.1994);
 
 Woroski v. Nashua Corp.,
 
 31 F.3d 105 (2d Cir.1994). The three steps are as follows:
 

 [flirst the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to “articulate some legitimate, nondiscriminatory reason for the employee’s rejection ...” Third, should the defendant earry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
 

 Burdine,
 
 450 U.S. at 252-53, 101 S.Ct. at 1093 (quoting
 
 McDonnell Douglas,
 
 411 U.S. at 802, 804, 93 S.Ct. at 1824-25, 1825).
 
 See also St. Mary’s Honor Center v. Hicks,
 
 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
 

 To establish a prima facie case of wrongful termination under the ADEA, a plaintiff must show that: (1) he is a member of the protected category (forty or over); (2) he was qualified for his position; (3) he was terminated; and (4) the termination occurred under circumstances giving rise to an inference of age discrimination.
 
 See Viola, supra,
 
 at 716 (citing
 
 Woroski,
 
 supra). In establishing this prima facie case a plaintiffs burden is
 
 de minimis. Chambers, supra,
 
 at 37.
 

 In eases where a plaintiff articulates a prima facie case and the defendant proffers a legitimate reason for the termination, the analysis often turns on the last prong of the
 
 McDonnell Douglas
 
 test,
 
 i.e.,
 
 whether a plaintiff can establish that the rationale offered was a mere pretext for discrimination.
 
 See Viola, supra,
 
 at 716. In such cases, to defeat the employer’s motion for summary judgment, the “plaintiff must show that there is a material issue of fact as to whether (1) the employer’s asserted reason for discharge is false or unworthy of belief and (2) [it is] more likely than not that the employee’s age was the real reason for the discharge.”
 
 Id
 
 (citing
 
 Woroski v. Nashua Corp.,
 
 31 F.3d 105 (2d Cir.1994) and
 
 St. Mary’s Honor Center, supra,
 
 509 U.S. at 515, 113 S.Ct. at 2751);
 
 see also Chertkova v. Conn. General Life Ins. Co.,
 
 92 F.3d 81 (2d Cir.1996) (Title VII);
 
 Van Zant v. KLM Royal Dutch Airlines,
 
 80 F.3d 708, 714 (2d Cir.1996) (Title VII);
 
 Quaratino v. Tiffany,
 
 71 F.3d 58, 64 (2d Cir.1995) (Title VII). “At all times the burden of persuasion remains
 
 *220
 
 with the plaintiff, who must prove by a preponderance of the evidence that any seemingly legitimate reason proffered by the employer is, in reality, a pretext for unlawful discrimination.”
 
 de la Cruz v. New York City Human Resources Admin. Dep’t of Social Services,
 
 82 F.3d 16, 20 (2d Cir.1996).
 

 In proving discriminatory motive, a plaintiff may rely on his prima facie case or may produce additional evidence of pretext and/or discriminatory intent.
 
 See Chambers, supra,
 
 at 38 (citing
 
 St. Mary’s Honor Center, supra,
 
 509 U.S. at 511, 113 S.Ct. at 2749). Indeed, the conflict between the plaintiffs prima facie evidence and the employer’s evidence of a nondiscriminatory reason will constitute a question of fact for the factfinder unless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject.
 
 See Cronin v. Aetna Life Ins. Co.,
 
 46 F.3d 196, 203 (2d Cir.1995). Thus, if plaintiff has failed to offer proof that could persuade a rational finder of fact that the employer’s justification was false and its true motive discriminatory, summary judgment is appropriate even though the same proof adequately establishes a prima facie case.
 
 Viola, supra,
 
 at 717,
 
 cited in Vandewalker v. Quandt’s Food Service Distrib. Inc.,
 
 934 F.Supp. 42, 46 (N.D.N.Y.1996). “[S]ummary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact.”
 
 Chambers, supra,
 
 at 40.
 

 Applying the above analytical framework to the facts of this case, I find that Kerber has established a prima facie case. It is undisputed that Kerber is a member of a protected class, and that he suffered an adverse employment action. I further find that he was qualified for his position and that his termination occurred under circumstances giving rise to an inference of discrimination: he was terminated following 22 years of employment and adequate (if not stellar) performance evaluations, and his job responsibilities were absorbed by other younger employees.
 
 See Woroski, supra,
 
 at 108 (“A plaintiff is not required to show that he was replaced by a younger, newly-hired employee”).
 

 However, I also find that defendants have proffered a legitimate reason for Kerber’s termination. It appears that after tolerating Kerber’s marginal to average performance for many years, in 1992 defendants began to demand that Kerber’s performance rise to meet the higher standards of other employees and the company generally. While it is unfortunate that someone employed for 22 years should find that his work has become unsatisfactory due to rising standards, this alone does not constitute unlawful discrimination.
 

 Defendants also offer evidence that employees younger than 40 recently have been terminated, and employees as old or older than Kerber have remained long-term employees. Specifically, in 1992, a 27 year old male was terminated, and in May 1993, a 38 year old male was terminated, both for unsatisfactory work performance. By contrast, defendants point out that Carpenter himself is in his mid-50’s, another engineer is also in his 50’s, and two male employees elsewhere in the company are 69 and 80, respectively. While this evidence does not conclusively resolve the issue, it does suggest that employment decisions at CJW are not based upon age.
 

 Accordingly, the focus now shifts back to Kerber to demonstrate that defendants’ stated reasons are pretext for discrimination. Specifically, Kerber must produce “not simply ‘some’ evidence, but ‘sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge.’”
 
 Van Zant, supra,
 
 at 714 (quoting
 
 Woroski, supra,
 
 at 110),
 
 cited in Mania v. Alper Holdings USA Inc.,
 
 No. 95-CV-1846, 1996 WL 438162 (S.D.N.Y. August 5,1996).
 

 Kerber asserts that defendants’ stated reasons for terminating him are pretext for discrimination. In support of this position, Kerber points to Carpenter’s comments to Kerber’s response to his June 1993 performance evaluation. Regarding Carpenter’s
 
 *221
 
 comment that “I came to the conclusion, rightly or wrongly, that [Kerber] was incapable of much improvement”, Kerber alleges that this statement is tantamount to saying “you can’t teach an old dog new tricks” and therefore evidence of age discrimination. Regarding Carpenter’s comment that Kerber began organizing a filing system “only after his peers became extremely frustrated with the archaic and wasteful methods [Kerber] used”, Kerber asserts that Carpenter’s use of the word “archaic” is evidence of age discrimination.
 

 I disagree. I do not believe that an assessment of poor performance is tantamount to a comment on Kerber’s age. There is nothing about Carpenter’s choice of language to suggest that Carpenter’s frustration with Kerber was due to his age, as opposed to his ability.
 

 Nor do I find the use of the word “archaic” to evidence age-based animus. Carpenter used the word archaic to describe Kerber’s methods: not Kerber himself.
 

 Additionally, Kerber asserts that he was the only employee subjected to Carpenter’s “stop watch” treatment, thus evidencing age discrimination. This too is unpersuasive. While Kerber may have been the only employee timed in this manner, by itself this treatment only demonstrates Carpenter’s frustration with Kerber’s timeliness and his own time-keeping records. There is no evidence to suggest discriminatory motives.
 

 Finally, Kerber asserts that because his job was taken over by Allart, a younger employee, this too is evidence of discriminatory motive. I disagree. Allart was familiar with Kerber’s job responsibilities, having performed them on days when Kerber was absent. Thus, he was the obvious choice to perform those tasks following Kerber’s departure. CJW did not hire anyone new to help out. Without more, I find no discriminatory motive behind this decision.
 

 Thus, I find that Kerber has failed to demonstrate the existence of a genuine issue of material fact as to the defendants’ motive. None of the actions identified by Kerber reasonably suggests that defendants were unlawfully motivated. Each is “consistent with the conduct of nondiscriminatory business affairs”
 
 (Viola, supra,
 
 at 717) and there is no evidence that easts the actions in any other light. This is not a case where the plaintiff has identified actions or statements that reasonably raise an inference of improper motive.
 
 See, e.g., Chertkova, supra
 
 (concrete evidence of pretext existed where female plaintiffs supervisor avoided discussing business with her in favor of discussing his personal exploits and her manner of dress, and other examples of disparate treatment of women existed);
 
 Vandewalker, supra,
 
 (concrete evidence of pretext existed where female plaintiff employee could identify nearly a dozen examples of treatment different from comparable males, including being subjected to inappropriate remarks about her gender).
 

 In fact, there is no evidence prior to the administrative actions preceding this lawsuit that even Kerber believed that his age motivated defendants in their job actions. Although plaintiff disagreed with the criticism of his work and attempted to explain it away, he never attributed his age as the basis for the poor performance reviews.
 

 The record amply demonstrates that there was long-term apprehension about Kerber’s competency. Kerber’s termination was not a precipitous act. Although plaintiff may have disagreed, it is evident that his superior, Carpenter, had serious, documented concerns about Kerber’s ability to perform adequately. Kerber’s proffered evidence that these concerns were pretextual are totally unpersuasive and are not sufficient to rebut defendants’ evidence of legitimate discharge. Thus, I am satisfied that no rational jury could find that defendants’ decision to terminate Kerber was motivated by age bias.
 
 Woroski, supra,
 
 at 110 (citing
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
 

 There is one final area of disagreement which, although not raised by Kerber, I will address and dispose of for the record. It appears that Carpenter and Kerber disagree as to what was said during Carpenter’s inquiries to Kerber about the status of the extra projects. Carpenter asserts that he told Kerber that completing the projects was imperative. Carpenter Afft at ¶ 16. Kerber
 
 *222
 
 asserts that Carpenter merely asked how he was doing on them. Kerber Deposition, pp. 98-103. Also, despite Carpenter’s conclusion that Kerber would never seek to improve his performance, it appears that in the weeks prior to his termination, Kerber did complete a handful of assigned projects. Defs’ Ex. 0, P, Q; Kerber Deposition at pp. 79-103.
 

 While these facts may create an issue as to whether Kerber was fully aware of the importance of finishing the projects and whether Carpenter failed to credit Kerber with some modest performance improvements, neither relates to the suggestion that age was a factor in Kerber’s termination. In other words, neither creates a material issue of fact as to whether it is more likely than not that age was the real reason for Kerber’s discharge. Thus, such fact issues are insufficient to avoid summary judgment.
 
 See Anderson, supra,
 
 at 248, 106 S.Ct. at 2510 (1986) (“Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.”),
 
 cited in Van Zant, supra,
 
 at 714.
 

 Thus, because Kerber has failed to raise any genuine issues of material fact, defendants’ motion for summary judgment on this claim must be granted. Kerber’s ADEA claim is dismissed.
 
 [4]
 

 C.
 
 ERISA Claim
 

 Kerber also asserts that his termination violates ERISA § 510, 29 U.S.C. § 1140. That statute provides that “[i]t shall be unlawful for any person to discharge ... a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled----” This section prohibits an employer from discharging an employee in order to keep him or her from obtaining vested pension rights.
 
 See Dister v. Continental Group, Inc.,
 
 859 F.2d 1108, 1111 (2d Cir.1988).
 

 It is unclear precisely what benefits Kerber claims to have been denied. Kerber does not identify any specific benefit plan except for a 401(k) retirement plan, in which he participated. Thus, it appears that Kerber’s Section 510 claim is based upon his inability to continue to contribute to his 401(k) plan (and thus generate more retirement income).
 

 This loss alone is not cognizable under ERISA Section 510. There is no evidence whatsoever that defendants were motivated by a desire to curtail Kerber’s ability to contribute to the 401(k) plan. Kerber’s “loss” appears to be entirely incidental to his termination.
 
 See Clapp v. Greene,
 
 743 F.Supp. 273, 276 (S.D.N.Y.1990) (no ERISA claim where termination prevented plaintiff from continuing to enroll in firm’s pension benefit and health and medical plans),
 
 ajfd,
 
 930 F.2d 912 (2d.Cir.),
 
 cert. denied,
 
 502 U.S. 868, 112 S.Ct. 197, 116 L.Ed.2d 157 (1991);
 
 Kelly v. Chase Manhattan Bank,
 
 717 F.Supp. 227, 232 (S.D.N.Y.1989) (no ERISA claim where employee’s termination prevented him from accruing additional benefits in fully vested pension plan);
 
 see also Dister, supra,
 
 at 111 (plaintiff must show more than “lost opportunity to accrue additional benefits”) (citations omitted). Accordingly, his ERISA claim must be dismissed.
 

 D.
 
 Common Law Claims
 

 Finally, Kerber asserts that his termination constitutes negligent and/or intentional infliction of emotional distress. These claims too must be dismissed as an improper attempt to “circumvent New York’s at-will employment rule.”
 
 Tischmann v. ITT/Sheraton Corp.,
 
 882 F.Supp. 1358, 1368 (S.D.N.Y. 1995).
 

 New York does not recognize any tort causes of action arising out of abusive or wrongful discharge of an at-will employee.
 
 See Murphy v. American Home Products Corp.,
 
 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). Even if it did, a claim for intentional infliction of emotional distress re
 
 *223
 
 quires conduct “so outrageous, ... so extreme, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.”
 
 Id.
 
 at 303, 461 N.Y.S.2d 232, 448 N.E.2d 86. Certainly, defendants’ treatment of Kerber cannot be said to meet this high standard.
 
 [5]
 

 As for Kerber’s negligent infliction of emotional distress claim, such cause of action can be sustained “only in unique circumstances, where a defendant owes a special duty only to the plaintiff.”
 
 Cucchi v. New York City Off-Track Betting Corp.,
 
 818 F.Supp. 647, 656 (S.D.N.Y.1993). The termination of an at-will employee does not give rise to a claim for negligent infliction of emotional distress because a corporation owes the same duties to all employees.
 
 Id.
 
 (citations omitted).
 

 Accordingly, Kerber’s intentional and negligent infliction of emotional distress claims are dismissed.
 

 CONCLUSION
 

 For all the above reasons, I hereby GRANT defendants’ motion for summary judgment (#8). Kerber’s complaint is dismissed in its entirety.
 

 IT IS SO ORDERED.
 

 [1]
 

 . Defendants claim that because the engineers' regular workloads varied considerably from day to day, each of them regularly was assigned additional projects to work on during slow periods. Defendants claim that other engineers successfully juggled dozens of extra projects, some requiring hundreds of hours. Defs' Motion, Ex. Q, p. 2.
 

 [2]
 

 . Indeed, there were two other projects assigned to Kerber on April 23, 1992 and May 4, 1992 which were reassigned to other engineers in October and July of that year allegedly because Kerber had not yet begun working on them and they needed to be completed. Defs’ Motion, Ex. Q, p. 2.
 

 [3]
 

 . Although Kerber asserts that this case contains direct evidence of discrimination, I disagree. The evidence relied upon by Kerber as direct evidence is identical to that on which he relies upon to show pretext. This evidence is properly analyzed as pretext evidence.
 
 See infra.
 

 [4]
 

 . The same elements and burdens of proof apply to claims brought under the ADEA the NYHRL.
 
 Wanamaker v. Columbian Rope Co.,
 
 907 F.Supp. 522, 528 and 533, n. 15 (N.D.N.Y.1995) (citing
 
 Spence v. Maryland Cas. Co.,
 
 995 F.2d 1147 (2d Cir.1993)). Accordingly, Kerber’s NYHRL claim is dismissed as well.
 

 [5]
 

 . Kerber’s intentional infliction of emotional distress claim is also barred by the one year statute of limitations. This action was not initiated until roughly 20 months after he was terminated.