Bobby L. SMITH, Plaintiff,

v.

**CADBURY BEVERAGES, INC.,**
a/k/a Cadbury Schweppes,
Inc., Defendant.

No. 94–CV–6512L.

United States District Court,
W.D. New York.

Sept. 30, 1996.

Roy W. King, Rochester, NY, for Bobby L. Smith.

Carl R. Krause, Harris, Beach & Wilcox, Rochester, NY, for Cadbury Beverages, Inc.

## DECISION AND ORDER

LARIMER, Chief Judge.

This is a discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* 42 U.S.C. §§ 1981, 1983, and 1985; and the New York Human Rights Law, Executive Law § 296. Plaintiff Bobby Smith ("Smith") alleges that defendant Cadbury Beverages, Inc. ("Cadbury") unlawfully discriminated against him due to his race and in retaliation for filing complaints against Cadbury.

Presently before me is Cadbury's motion for summary judgment and Smith's cross-motion to amend his complaint. For the reasons set forth below, Cadbury's motion is granted and Smith's motion is denied.

## BACKGROUND[1]

Smith is an African–American male who was employed during the relevant time period by Cadbury. Among other products, Cadbury makes and distributes applesauce.

Smith's claims arise out of three employment incidents: Cadbury's 3–day suspension of Smith without pay following a performance error on January 19, 1993; Cadbury's alleged failure to promote Smith in March 1993; and Cadbury's alleged failure to pay Smith the proper amount during a one-week period in March 1993. Smith alleges that each of these incidents was unfair and moti-

---

1. Except where indicated, these facts are undis-

vated by racial discrimination and/or retaliation. Cadbury denies wrongdoing with respect to each incident and particularly denies that its actions were at any time motivated by racial animus or retaliation.

### The Suspension:

In January 1993 Smith was one of two "caser" or "packer" operators on an assembly line packaging applesauce. His job was to load flat boxes into a large packing machine, which then folded and fitted the boxes around six-packs of applesauce. A coding machine, located further down the assembly line, printed day and time codes on every box coming from the packing machines.

On January 19, 1993, Smith worked the "A" shift, from midnight to 8:00 a.m. On that night, applesauce bound for Canada was being packaged in boxes marked with both English and French language. Toward the end of that shift, employees known as "tow motor operators" delivered to the assembly line boxes designed for shipping in the United States. These boxes had only English language on the outside. They were erroneously loaded into a packing machine and used to pack several hundred cases of Canadian-bound applesauce. Once discovered, the error had to be corrected. This took extra man hours and resulted in the destruction of the boxes.

Smith's supervisor (John Adam) determined that the mispackaged product primarily came from the packing machine operated by Smith. Adam made this determination based upon the position of the day code stamp on the mispackaged boxes. Because the boxes from Smith's packing machine approached the coding machine from a 180 degree different angle than the boxes coming from the other packing machine, the codes were allegedly printed on different places on the boxes. Moreover, the other packing machine apparently was not working during most of the relevant time period due to a mechanical problem. Thus, Adam determined that roughly 500 mispackaged boxes came from Smith's machine.

Adam also determined that another packer operator (Helen Snyder), working on a dif-

---

puted.

ferent assembly line, did the same thing. Snyder was responsible for mispackaging roughly 130 boxes of applesauce.

Adam reported the errors to the Human Resources Manager, Michael Meador. As a result, Smith was suspended for 3 days, without pay. Snyder was reprimanded and a record made in her personnel file. A third employee, Kristine Bohnke, who was a quality control inspector, was also reprimanded for failing to catch the errors. None of the tow motor drivers who delivered the incorrect boxes was disciplined.

Because the other employees (none of whom were African–American) were disciplined less severely than Smith, he alleges that Cadbury was motivated by discrimination in imposing the discipline against him.

### The Promotion:

It is Cadbury policy that any employee who works temporarily in a single job classification for a period of one year be promoted permanently into that job classification. Smith alleges that he was eligible for such a promotion after working at the Grade 6 pay level for one year prior to March 1993. Smith was not promoted until 1994. Smith alleges that several Caucasian employees with similar work histories (Kevin Hilligeer, Eileen LeGant and Wayne Vermeulen) were promoted in March 1993, and that Cadbury's failure to promote him at that time was the result of discrimination.

### One Week's Pay:

During March 1993, Smith was working as a General Laborer Grade 2. Smith alleges that on or about the week of March 19, 1993, he was asked to fill in as a tow motor driver, a Grade 5 job, because the regular driver was out sick. The job of tow motor driver pays at a rate higher than that of a Grade 2 laborer. Smith alleges that for one week he worked as a tow motor driver but was paid as a Grade 2 laborer. This, Smith alleges, was the result of discrimination.

### Smith's Prior Complaints:

Prior to these three incidents, Smith had brought administrative and legal complaints against Cadbury alleging that Cadbury had discriminated against Smith in other contexts.

In June 1988, Smith filed an administrative complaint with the New York State Division of Human Rights ("NYSDHR") alleging that he had received lower pay than his Caucasian counterparts performing the same job. In December 1991, Smith filed another administrative complaint with the NYSDHR alleging that following a lapse in applesauce quality, Cadbury disciplined him more severely than two Caucasian employees, because of his race and in retaliation for a prior complaint. Both administrative complaints were investigated and dismissed by the NYSDHR, which determined that there was no probable cause to believe that Cadbury had engaged in unlawful discriminatory behavior.

Finally, on March 17, 1993, Smith filed a lawsuit in the Western District of New York, alleging a variety of discriminatory acts by Cadbury. This lawsuit was discontinued voluntarily by stipulation in November 1993, on the merits and with prejudice.

### CADBURY'S MOTION FOR SUMMARY JUDGMENT

Cadbury moves to dismiss the instant complaint in its entirety. Pursuant to Fed. R.Civ.P. 56(c), a moving party is entitled to a judgment as a matter of law if there is "no genuine issue as to any material fact" and where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita, supra,* 475 U.S. at 586, 106 S.Ct. at 1356. "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) (alteration in original)). However, at the summary judgment stage,

when perusing the record to determine whether a rational fact-finder could find for the non-moving party, all reasonable inferences must be drawn in favor of the non-moving party. *See Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

■ The general principles underlying a motion for summary judgment apply no less to this action simply because it is an employment discrimination case. It is true that courts exercise caution when considering whether to grant summary judgment in cases where an employer's intent is at issue. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). However, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 40 (2d Cir.1994). For a plaintiff in a discrimination case to survive a motion for summary judgment, he must do more than present "conclusory allegations of discrimination," *Meiri v. Dacon*, 759 F.2d 989 (2d Cir.) *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); he must offer "concrete particulars" to substantiate the claim. *Id.*, cited in *Duprey v. Prudential Ins. Co. of Am.*, 910 F.Supp. 879 (N.D.N.Y.1996).

### THE MCDONNELL DOUGLAS BURDEN–SHIFTING ANALYSIS

■ Because Smith has no direct evidence of discrimination, the three-part analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and later refined by *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) is applied to evaluate Smith's discrimination claims.[2] The three steps are as follows:

[f]irst the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for [its actions] ..." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093 (quoting *McDonnell Douglas*, 411 U.S. at 802, 804, 93 S.Ct. at 1824, 1825). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In cases where a plaintiff articulates a prima facie case and the defendant proffers a legitimate reason for its actions, the analysis often turns on the last prong of the *McDonnell Douglas* test, *i.e.*, whether a plaintiff can establish by a preponderance of the evidence that the rationale offered was a mere pretext for unlawful discrimination. *See de la Cruz v. New York City Human Resources Admin. Dep't of Social Services*, 82 F.3d 16, 20 (2d Cir.1996); *see also Chertkova v. Conn. General Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996). In such cases, "to defeat the employer's motion for summary judgment, the plaintiff must show that there is a material issue of fact as to whether (1) the employer's asserted reason for its action(s) is false or unworthy of belief and (2) it is more likely than not that a discriminatory motive was the real reason for the action." *Chertkova, supra*, at 92 (citing *Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir.1994) and *St. Mary's Honor Center, supra*); *see also Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708 (2d Cir.1996).

In proving discriminatory motive, a plaintiff may rely on his prima facie case or may produce additional evidence of pretext and/or discriminatory intent. *Chambers v. TRM Copy Centers Corp*, 43 F.3d 29, 38 (2d Cir. 1994) (citing *St. Mary's Honor Center, supra*, 509 U.S. at 511, 113 S.Ct. at 2749). Indeed, the conflict between the plaintiff's prima facie evidence and the employer's evidence of a

---

**2.** The elements and burdens of proof are the same for discrimination claims brought pursuant to Title VII, 42 U.S.C. § 1981, and the NYHRL. *See Walters v. Atlanta*, 803 F.2d 1135 (11th Cir. 1986); *Wanamaker v. Columbian Rope Co.*, 907 F.Supp. 522 (N.D.N.Y.1995).

nondiscriminatory reason will constitute a question of fact for the factfinder unless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir.1995). Thus, if plaintiff has failed to offer proof that could persuade a rational finder of fact that the employer's justification was false and its true motive discriminatory, summary judgment is appropriate even though the same proof adequately establishes a prima facie case. *See Vandewalker v. Quandt's Food Service Distrib. Inc.*, 934 F.Supp. 42, 46–47 (N.D.N.Y.1996) (citing *Viola v. Philips Medical Systems of N. Am.*, 42 F.3d 712 (2d Cir.1994)). "[S]ummary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers, supra,* at 40.

Applying these standards to the case before me, I now turn to the three incidents underlying Smith's claims and analyze them for both race discrimination and retaliation.

### A) *Race Discrimination:*

#### (i) *The Suspension:*

■ To establish a prima facie case of wrongful suspension, Smith must show (1) that he engaged in prohibitive conduct similar to that of a person of another race, color or national origin, and (2) that he was disciplined more severely than those individuals. *Lawrence v. Baker*, 1991 WL 148286, *11, 56 F.E.P. 1565, 1574 (N.D.N.Y.1991), *aff'd*, 963 F.2d 1522 (2d Cir.), *cert. denied*, 506 U.S. 889, 113 S.Ct. 254, 121 L.Ed.2d 186, *reh'g denied*, 506 U.S. 1016, 113 S.Ct. 646, 121 L.Ed.2d 575 (1992).

Cadbury asserts that Smith cannot establish a prima facie case of discrimination arising from the suspension because Smith cannot show that he was treated differently than anyone else. As packer operator, Smith's job was to ensure that the right box is used and that the day code properly printed. Thus, according to Cadbury, he was the person most responsible for the several hundred mispackaged boxes.

■ Smith was a full-time union employee and thus subject to Cadbury's progressive discipline policy. That policy provided that an employee receiving three notices of poor performance in an 18 month period could be suspended and an employee receiving four such notices could be terminated. Between September 1991 and January 1993 Smith had received four notices of poor performance. Thus, according to Cadbury policy, he could have been terminated following the applesauce incident. Instead, Human Resources Manager Meador chose a more lenient punishment: suspension.

According to Cadbury, none of the other employees involved in the applesauce incident was subject to this disciplinary policy and none had four prior notices. Moreover, none committed an error of the same magnitude. Thus, none was similarly situated as Smith.

Helen Snyder was a seasonal employee with no prior performance problems. Her error resulted in roughly 130 mispackaged boxes of applesauce. Cadbury alleges that, short of termination, the only discipline for seasonal employees is to note for future hiring purposes that the employee's skills are limited. This is what was done with respect to Helen Snyder.

Cadbury alleges that Christine Bohnke was also different from Smith. She was a relatively new, nonunion employee with no prior performance problems. As quality control technician, she should have detected the error at some point after it occurred. She was counseled about the applesauce incident and after several such counseling sessions left Cadbury altogether, by mutual agreement.

Finally, none of the tow motor operators was disciplined at all. Cadbury asserts that it was not the tow motor operators' job to ensure that the proper boxes were placed into the packing machines. Indeed, it was not uncommon at the end of a shift for the tow motor operators to deliver additional and different boxes to be used during the next shift. This appears to be what happened on January 19, 1993 because Smith's assembly line was scheduled to change over to American-bound product at 8:00 that morning.

Thus, because none of the other employees cited by Smith was in an employment situation comparable to Smith's, and because none committed an error of the same magnitude as Smith did, Cadbury asserts that he has failed to establish a prima facie claim.

Although I believe that plaintiff has met the rather easy test for establishing a prima facie case, I also find that Cadbury has proffered a legitimate, nondiscriminatory reason for Smith's discipline and that Smith has failed to carry his burden of showing pretext.

Because Smith was a full-time, union employee with four prior performance errors, his punishment was in accordance with the Cadbury progressive discipline policy. Smith does not dispute either the existence of his prior disciplinary record or Cadbury's policy in such situations. Indeed, just one month after Smith was disciplined another packer operator who was also a union member (Lee Craig), was disciplined in accordance with the progressive discipline policy for making precisely the same error Smith made, i.e., allowing applesauce to be packaged incorrectly. Craig is Caucasian.

Additionally, Cadbury also has proffered well-documented, reasonable explanations for how the others involved in the applesauce incident were disciplined: each in accordance with their respective positions as well as their role in the incident.

■ Thus, the focus now shifts back to Smith, who must carry his burden of persuasion that Cadbury was motivated by unlawful racial and retaliatory bias. *Chertkova, supra*, at 87; *see also de la Cruz, supra*, at 20. This Smith cannot do. Although Smith pro-

pounds a number of alleged factual disputes, I find that none is adequately supported and therefore not sufficient to defeat Cadbury's motion.

Smith alleges that checking the boxes was not his job. He alleges that he was only supposed to check the "day code" and not the "UPC code" on the applesauce boxes and thus, apparently, it was not his responsibility to check the overall correctness of the boxes.[3] In support of this position he points to the collective bargaining agreement between Cadbury and the union, in which a packer operator's duties are loosely described. The description does not state "check UPC codes on boxes." However, it also does not state "check day code on boxes" a task which Smith admits was part of his job. This brief job description in the collective bargaining agreement clearly does not purport to be an all-inclusive list of required job duties. It is not persuasive evidence that checking the overall correctness of the boxes was not Smith's job.[4]

Thus, Smith's claim that "it was not his job" to check the boxes cannot overcome Cadbury's reasonable and consistent description of Smith's job responsibilities, especially since those very same job responsibilities were required of two other packer operators (Helen Snyder and Lee Craig), who are Caucasian.[5] *See Woroski, supra*, at 109–10 ("*some* evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff . . . must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false,

---

3. Cadbury does not assert that Smith was supposed to check "UPC codes": only that the correct boxes are used. I will assume for purposes of this motion that the two are the same, at least in Smith's view.

4. The job description contained in the Agreement states as follows: "Caser Operator B—Required to operate machine efficiently in conjunction with line speed, make minor adjustments as needed, do necessary cleaning of machine for continual operation, and keep a clean orderly work area." Defendant's Ex. 2.

5. Smith also points to an incident report prepared by Quality Control personnel, which iden-

tified the "assignable cause" as "tow motor driver brought wrong cartons to line." According to Smith, this report proves that the tow motor operators are to blame for the incident.

Cadbury asserts that the Quality Control report was preliminary (completed prior to Adam's investigation of the incident), and that such reports are used solely to identify and track quality problems, not to assign blame. It was John Adam's investigation that determined who was "at fault."

Again, this explanation is consistent with the fact that Helen Snyder and Lee Craig, other packer operators, were also disciplined for mispackaging applesauce. Smith offers no evidence other than his uncorroborated allegations to rebut Cadbury's explanation.

and that more likely than not the employee's age was the real reason for the discharge"); *see also Van Zant, supra,* at 714 (same).

Smith also alleges that the coding machine marks each box in the same manner, thus making it impossible to tell from which packing machine the mispackaged cases came. However, this claim is wholly unsupported. In fact, Cadbury has produced evidence that the union withdrew the grievance filed on Smith's behalf regarding the applesauce incident after John Adam explained to the union representative (an African American) precisely how he determined that the mispackaged applesauce came from Smith's machine.

More importantly, however, none of Smith's allegations raises an inference of discrimination. Although they might suggest that Cadbury's stated reasons for discipline are not true, they do not suggest in any way that discrimination was the real reason behind the discipline. *See Van Zant, supra,* at 714.

Smith also cites past incidents of alleged discriminatory acts against him by Cadbury to suggest that its motives could be unlawful. For instance, Smith alleges that in 1988 and 1991 he was paid less than comparable Caucasian employees; he alleges that in 1991 he was the only employee demoted for an incident that was not his fault but the fault of antiquated equipment; and he alleges that the company's long-time smoking policy (which permitted smoking on "the dock") was changed only after he began smoking there. However, these allegations too are totally unsupported. Indeed, two of them constitute the bases for the earlier administrative complaints, which were dismissed as unsupported following NYSDHR investigation.

In short, Smith produces no persuasive evidence whatsoever to corroborate his allegations. There is no evidence of improper remarks by Cadbury management, no evidence of other African–American employees being treated disparately, and no evidence of anything else that might suggest an improper motive. *Cf. Chertkova, supra* (evidence of pretext existed where female plaintiff's supervisor avoided discussing business with her in favor of discussing his personal exploits and her manner of dress, and other examples

of disparate treatment of women existed); *Vandewalker, supra,* (concrete evidence of pretext existed where female plaintiff employee could identify nearly a dozen examples of treatment different from comparable males, including being subjected to inappropriate remarks about her gender). Without more, Smith's unsupported allegations cannot defeat Cadbury's well supported, legitimate, nondiscriminatory explanation for its actions. *See Van Zant, supra,* at 714; *Woroski, supra,* at 109–10. This claim must be dismissed.

### The Promotion:

█ In order to establish a prima facie case of discrimination in failing to promote him, Smith must show that (1) he belongs to a protected class, (2) he applied for and was qualified for a job promotion, (3) he was rejected despite his qualifications, and (4) the promotion was given to a Caucasian employee. *See Sweeney v. Research Foundation of SUNY,* 711 F.2d 1179, 1185 (2d Cir.1983); *Bradley v. Nat'l R. Passenger Corp.,* 797 F.Supp. 286, 291 (S.D.N.Y.1992).

█ Cadbury asserts that Smith cannot establish a prima facie case of promotion discrimination because he cannot demonstrate that he was qualified for the promotion he sought. According to Cadbury, Smith misconstrues the promotion policy: promotions are granted following twelve months of work in the same job classification. However, a job classification is not the same as a wage grade. Smith was a Grade 6 laborer for one year prior to March 1993, but he had several different job classifications during that year.

Thus, because Cadbury's employment records show that Smith worked in a variety of positions during the year preceding March 1993, he was not qualified pursuant to Cadbury's promotion policy. In 1994, after Smith worked as a relief operator for twelve uninterrupted months, he was promoted.

Additionally, Cadbury asserts that Smith is incorrect in his assertion that employees LeGant, Hillegeer and Vermeulen were promoted after working in different jobs for one year. Cadbury provides documentary and testimony evidence that LeGant and Hille-

geer were promoted after working as relief operators for a period in excess of twelve months, and that employee Vermeullen was hired into a position which Smith did not bid on. Meador Reply Aff't. Thus, asserts Cadbury, its actions (or inactions) with regard to Smith and the other employees were the result of its business policies, not discrimination, and Smith has failed to demonstrate a prima facie case of promotion discrimination.[6]

I agree. Because Smith cannot demonstrate that he was qualified for a promotion, he cannot establish a prima facie case. Even if he could, however, I find that Cadbury has offered well supported, legitimate, nondiscriminatory reasons for its actions, and Smith has failed to adequately rebut them. Indeed, Smith offers no evidence other than his own conclusory allegations to counter Cadbury's explanation of its actions. This claim must be dismissed. *See York v. Mobil Oil Corp.*, 1991 WL 53337, *2, 55 F.E.P. 121 (N.D.N.Y.1991) ("[I]t is plaintiff's burden to demonstrate that there is some evidence, more than conclusory allegations or mere speculation, which would create a genuine issue of material fact. The bare assertion of claims of bias, merely because they implicate issues involving the defendant's state of mind, should not preclude pre-trial disposition of a case").

### One Week's Pay:

Finally, Cadbury asserts that Smith's claim about his one week of pay cannot be sustained because Smith offers no evidence whatsoever in support of the claim, and Cadbury's records indicate that Smith worked as a Grade 2 general laborer throughout the month and was properly paid as such. No other evidence exists because the "incident" is so remote in time.[7]

To establish a prima facie case of discrimination in this context, Smith would have to demonstrate that he was paid improperly under circumstances giving rise to an inference of discrimination. He has done neither. Smith has proffered no evidence except his conclusory allegation that he worked in a different job for one week in March 1993. Even if his allegation were true, however, there is nothing about Cadbury's alleged failure to properly pay that gives rise to an inference of discrimination. Thus, this claim too must be dismissed.

### B) *Retaliation:*

■ In addition to race discrimination, Smith alleges that each of the three incidents also was the result of unlawful retaliation for his prior complaints against Cadbury. In order to establish a prima facie case of retaliation, Smith must show that (1) he participated in a protected activity known to Cadbury, (2) he suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995).

■ Smith cannot sustain a retaliation claim with regard to his January 1993 suspension because he cannot establish a causal connection between it and his legal and administrative complaints. Absent direct evidence of retaliatory motive, a plaintiff may show retaliation indirectly by showing that the protected activity was followed closely by discriminatory treatment. *Lees v. Case–Hoyt Corp.*, 779 F.Supp. 717, 726 (W.D.N.Y. 1991). Both the 1988 and the 1991 NYSDHR complaints are too remote in time, and the March 1993 federal court complaint was filed *after* the suspension incident. Thus, there is no causal relationship between Smith's protected activities and his suspension. *See id., supra*, at 727 (no causal connection where plaintiff suspended 18 months after first verbal complaint and 4 months after administrative complaint filed).

Moreover, Cadbury has presented evidence that John Adam, the supervisor who cited Smith for the applesauce incident, was unaware of Smith's prior complaints. Thus, asserts Cadbury, no causal relationship could

---

6. Indeed, in support of its assertion that the promotion policy is applied without racial bias, Cadbury provides evidence that an African American female was promoted pursuant to that policy in April 1989.

7. Cadbury notes that Smith failed to raise this incident through the union grievance procedure. Had he done so it could have been investigated immediately following its alleged occurrence.

exist between Smith's suspension and his earlier complaints. Indeed, Cadbury points out that the person who suspended Smith—Michael Meador—did know of his prior complaints, but Meador gave a punishment more lenient than permitted under company policy.

As for Smith's failure to promote and failure to pay allegations, these incidents cannot support his retaliation claim for the same reason they cannot support Smith's race discrimination claim: even if Smith has established a prima facie case of retaliation, I find that he has not adequately rebutted Cadbury's stated reasons for its actions. In both the failure to promote and the failure to pay instances, Cadbury's stated explanation is legitimate and well supported. Smith counters with nothing but his allegations. This is insufficient to sustain his claims. *See Van Zant, supra.*

Finally, I note that with respect to all of Smith's discrimination claims, Cadbury has produced evidence that minorities constitute over 23% of its workforce, and that the plant where Smith was employed has never been fined, sanctioned or compelled to pay money as a result of any discrimination claim. While not conclusive in this case, such evidence (unrebutted by Smith) suggests that employment decisions at Cadbury are not racially based.

█ Thus, all of Smith's discrimination claims are dismissed. Cadbury's motion for summary judgment is granted in its entirety.[8]

### SMITH'S MOTION TO AMEND

█ Smith moves for leave to amend his complaint to add an additional retaliation claim and a claim brought pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* These claims arise as the result of Smith's suspension and termination from Cadbury in October 1995, two years after the incidents underlying Smith's original complaint.

---

8. In addition to Smith's Title VII, Section 1981, and NYHRL claims, Smith's Section 1983 claim must be dismissed because there is no allegation or evidence that Cadbury was acting under color of state law, and Smith's § 1985 claim must be dismissed because § 1985 does not confer a sep-

The circumstances leading up to Smith's new claims are as follows. In September 1994, Smith posted a large sign on property he had purchased right next to Cadbury's property, stating "CADBURY MOTT'S U.S.A. PRACTICE TACTIC OF RACISM KLU KLUX KLAN." In April 1995, Smith sent a letter to the President of Cadbury, complaining about unfair treatment and stating, *inter alia,* "now it is war time, the Bob Smith way. Let us just see what you are made of. A question? Who has the most to lose." Soon thereafter, Cadbury suspended Smith, with pay.

In June, Smith was notified that reinstatement depended upon his agreement to cease and desist "publishing in any forum (except a legal or administrative action) statements which disparage [Cadbury]," and Smith's agreement to undergo psychiatric evaluation. On or about July 5, 1995, Smith filed an administrative complaint with the NYSDHR, alleging, *inter alia,* that the conditions of his reinstatement violated his First Amendment rights.

Smith was evaluated by one Dr. Neal Borenstein who concluded in an October 4, 1995 letter that "there does not appear to be an acute risk of harm to himself or others due to mental illness at the present time. Although there is no evidence of acute risk of harm to self or others, definitive prediction of his future behavior cannot be made." By letter dated October 27, 1995, Smith's employment was terminated. The letter, signed by Michael Meador, stated that "[b]ased on the Company's review of the information that it has obtained, there is no reasonable assurance that your return to work would not present a danger to your fellow employees."

Smith alleges that he was terminated in retaliation for posting the sign on his property and writing the April 1995 letter to Cadbury's President, both of which he considers to be protected, First Amendment activities. He also alleges that Cadbury has violated the

arate right of action for injuries redressed by Title VII. *See Ladson v. Ulltra East Parking Corp.,* 853 F.Supp. 699, 703–704 (S.D.N.Y.1994) (citing *Great Am. Fed. Sav. and Loan v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979)).

ADA by terminating him due to a perceived mental disorder. Accordingly, Smith moves to amend his complaint to add those claims.

Cadbury opposes on the grounds that it would be unduly prejudiced by such an amendment. Cadbury points out that the case was filed in October 1994; the Court's January 1995 scheduling order provided that the deadline for amending pleadings had already passed and that discovery was to be completed by October 31, 1995. All discovery was in fact completed by October 1995 and Cadbury made its motion for summary judgment in November 1995. Based upon this procedural posture, Cadbury asserts that allowing Smith now to add claims arising out of different factual circumstances would be unduly prejudicial.

 I agree. Although Rule 15 states that leave to amend a pleading should be 'freely given,' I must consider the prejudice Cadbury might suffer as a result of the amendment. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). "Prejudice may result where the amendment seeks to add a new claim, derived from a different set of facts of which the original complaint did not provide adequate notice." *Chapman v. YMCA of Greater Buffalo*, 161 F.R.D. 21, 24 (W.D.N.Y.1995) (M.J. Heckman) (citing *Ansam Associates, Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d. Cir.1985).

In this case, Smith's new claims are based upon different factual circumstances, and in large part require application of different law. Accordingly, permitting Smith to amend essentially would open up an entirely new lawsuit. This would be highly prejudi-

cial to Cadbury, which has litigated the original claims and, but for my granting its motion for summary judgment, would be trial ready.

The stated purpose of Rule 15 is to allow a party to correct pleading deficiencies so that a case may be decided on the merits and not barred by a technicality. Granting Smith's motion would not further this purpose. Accordingly, Smith's motion to amend is denied. Moreover, because Smith may still be able to assert a separate action (assuming his new claims are legally sufficient), he is not significantly prejudiced by my denying his motion to amend.[9] *See Chapman, supra.* Accordingly, Smith's motion to amend is denied.

### CONCLUSION

For all the above reasons, Cadbury's motion for summary judgment (# 9) is GRANTED and Smith's motion to amend (# 14) is DENIED.

IT IS SO ORDERED.

---

**9.** I note, however, that while Smith's ADA and Title VII claims might survive a motion to dismiss, they are unlikely ultimately to prevail. To establish an ADA claim, a plaintiff must demonstrate that he is disabled, that he was otherwise qualified to perform his job, and that he was terminated because of his disability. Even if Smith were found to be disabled within the meaning of the ADA, he probably would not be found "otherwise qualified" to perform his job because he poses "a direct threat to the health or safety of other individuals in the workplace." *See* 42 U.S.C. § 12113(b); 29 C.F.R. § 1630.2(r) ("Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation"). It is

unlikely that an employer would be obliged to accommodate an employee who makes libelous and threatening statements regarding it. *See Palmer v. Circuit Court of Cook County*, 905 F.Supp. 499 (N.D.Ill.1995) (employer's summary judgment motion granted where plaintiff was discharged due to misconduct involving threatening statements: plaintiff not "disabled," not "otherwise qualified," and accommodation would be unreasonable).

Similarly, Smith's Title VII claim would likely fail because Smith's alleged "protected activities" took place thirteen and six months, respectively, prior to his termination. Thus, even if Smith's statements were found to be "protected activity" it is unlikely they would be found causally connected to his termination.